# IN THE SUPREME COURT OF TEXAS

══════════════

No. 12-0617

══════════════

UNION CARBIDE CORPORATION, PETITIONER,

v.

DAISY E. SYNATZSKE AND GRACE ANNETTE WEBB, INDIVIDUALLY
AND AS REPRESENTATIVES AND CO-EXECUTRIXES OF THE ESTATE OF
JOSEPH EMMITE, SR., JOSEPH EMMITE, JR., DOROTHY A. DAY,
VERA J. GIALMALVA AND JAMES R. EMMITE, RESPONDENTS

══════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

══════════════════════════════════════════════

**Argued October 10, 2013**


JUSTICE JOHNSON delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE WILLETT, and JUSTICE BROWN joined.

JUSTICE LEHRMANN filed a dissenting opinion.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE GUZMAN, JUSTICE LEHRMANN, and JUSTICE DEVINE joined.


This interlocutory appeal concerns an asbestos-related injury suit in which Union Carbide Corporation filed a motion to dismiss based on the plaintiffs' alleged failure to timely serve a statutorily compliant physician report. The Multi-District Litigation pretrial court denied the motion. On interlocutory appeal the court of appeals affirmed. It held that the plaintiffs did not file a

compliant report, but that the report requirement was unconstitutionally retroactive as applied to the plaintiffs' claims.

We agree with the court of appeals that a statutorily compliant report was not filed. But we disagree that, as applied in this case, the report requirements are unconstitutional. Accordingly, we reverse the judgment of the court of appeals and render judgment dismissing the suit.

## I. Background

Joseph Emmite, who died in June 2005, worked as an insulator at Union Carbide for nearly forty years before he began receiving disability in 1979. At that time, Joseph had numerous health issues including a kidney disorder that required steroid therapy, a torn biceps muscle, and chronic fatigue, weakness, and vertigo. He was hospitalized twice during the last year of his life. His last hospitalization was in May 2005, because of edema, or swelling, in his legs. His medical history reflected, among other matters, that Joseph had been unable to walk for two years because of a deteriorated hip joint, he was unable to feed himself, he had dementia, and he had previously been diagnosed as having asbestosis. X-rays, an ultra-sound, and a computerized tomography performed during his final hospitalization showed lung calcifications that were most likely due to asbestos exposure. Dr. Prince was called in as a consulting pulmonologist and diagnosed him as having pulmonary asbestosis. When Joseph died on June 15, 2005, his death certificate listed the cause of death as "Alzheimer's disease/dementia." In June 2007, the representatives of Joseph's estate and his surviving children (the Emmites)[1] filed a wrongful death suit against Union Carbide and thirty-

---

[1] The plaintiffs are Daisy E. Synatzske and Grace Annette Webb, individually and as representatives and co-executrixes of the estate of Joseph Emmite, Sr., Joseph Emmite, Jr., Dorothy A. Day, Vera J. Gialmalva, and James R. Emmite.

seven other defendants.[2]  As to Union Carbide the Emmites alleged that Joseph was exposed to asbestos throughout his work life there and the long-term exposure caused him to develop asbestosis, which in turn was a cause of his death.

Chapter 90 of the Texas Civil Practice and Remedies Code was enacted by the 79th Legislature in 2005, signed by the Governor in May 2005, and became effective on September 1 of that year.  Act of May 16, 2005, 79th Leg., R.S., ch. 97, § 1, 2005 Tex. Gen. Laws 169; *see* TEX. CIV. PRAC. & REM. CODE §§ 90.001–012.  Chapter 90 applies to actions commenced after its effective date and requires claimants—persons alleged to have suffered an asbestos-related injury and any persons seeking recovery of damages for or arising from the injury or death of the exposed person—to serve each defendant with a physician report meeting certain requirements.  TEX. CIV. PRAC. & REM. CODE §§ 90.001, 90.006.  Thus, Chapter 90 was law before Joseph died, although it did not apply to suits filed during the more than two months between his death and September 1, 2005.  *Id.* §§ 90.001–012.  Because the Emmites did not file suit until 2007, Chapter 90 applies to their claims.

In order to meet Chapter 90's requirements, the Emmites attached a report by Dr. Richard Kradin to their original petition.  Union Carbide responded with a motion to dismiss in which it

---

[2] The other defendants are no longer parties. They were AMF Incorporated; The Anchor Packing Company; Aqua-Chem, Inc. (d/b/a Cleaver-Brooks Division); A.W. Chesterton Company; Bondex International, Inc.; Carborundum Company, n/k/a Industrial Holdings Corporation; Certainteed Corporation; Crown Cork & Seal Co., Inc.; Foster Wheeler Corporation; Garlock, Inc.; Georgia Pacific Corporation; General Electric Company; General Refractories Company; Grefco, Inc.; Henry Vogt Machine Company; Ingersoll-Rand Company; Owens-Illinois, Inc.; Rapid American Corporation; Riley Power, Inc.; Triplex, Inc.; Ametek, Inc.; Uniroyal, Inc.; Viacom, Inc.; Westinghouse Electric Corporation; Wyatt Industries Inc.; Zurn Industries, Inc.; Bechtel Corporation; Fluor Corporation; Fluor Enterprises, Inc.; Mundy Industrial Maintenance, Inc.; Natkin & Company; Parsons Energy & Chemicals Group Inc.; Resco Holding, Inc.; Santa Fe Braun, Inc.; and Trinity Construction Company, Inc.

asserted that the report did not meet Chapter 90's requirements. The Emmites, in turn, served Union

Carbide with a report authored by Dr. J.D. Britton.

In September 2007, the MDL pretrial court[3] (the MDL court or trial court) held a hearing on

Union Carbide's motion to dismiss. At the hearing Union Carbide argued that the Emmites' claims

should be dismissed because neither Dr. Kradin's report nor Dr. Britton's report complied with

Chapter 90, primarily because neither report referenced pulmonary function testing showing that

Joseph suffered functional pulmonary impairment.[4] The trial court denied the motion to dismiss

orally, but did not deny it by written order.

Union Carbide moved for reconsideration and the trial court conducted a hearing on that

motion. In its motion and at the hearing, Union Carbide reiterated its position that the suit should

be dismissed because Chapter 90 required pulmonary function testing and testing was neither

performed on Joseph nor mentioned in a physician's report. The Emmites informed the court that

they were seeking an amended death certificate showing asbestosis as a cause of death. In light of

the Emmites' representations, the trial court left the record open for six weeks and indicated that

---

[3] *See* TEX. CIV. PRAC. & REM. CODE § 90.010.

[4] A section 90.003 report must:

> verif[y] that the exposed person has asbestos-related pulmonary impairment as demonstrated
> by pulmonary function testing showing:
>> (i) forced vital capacity below the lower limit of normal or below 80 percent of
>> predicted and FEV1/FVC ratio (using actual values) at or above the lower limit of
>> normal or at or above 65 percent; or
>> (ii) total lung capacity, by plethysmography or timed gas dilution, below the lower
>> limit of normal or below 80 percent of predicted.

*Id.* § 90.003(a)(2)(D). If a claimant's pulmonary function test results do not meet the requirements of section
90.003(a)(2)(D), a physician's report meeting the requirements of section 90.003(c) may be substituted. That section
requires the physician's report to include, among other matters, "the specific pulmonary function test findings on which
the physician relies to establish that the exposed person has restrictive impairment." *Id.* § 90.003(c)(3).

4

Union Carbide's motion would be granted if the death certificate was not amended during that time to reflect asbestosis as a cause of death.

Six weeks later, the Emmites again served Union Carbide with Dr. Britton's report and asserted for the first time that the report complied with section 90.010(f)(1)—the "safety valve" provision of Chapter 90 which provides an alternative from the report standards in section 90.003—even though the Emmites had declined to rely upon that section at the November hearing.[5] The trial court held another hearing in January 2008. At that hearing the Emmites informed the court they were still awaiting the amended death certificate, but they had learned in discovery that Joseph had pulmonary function tests performed during his employment with Union Carbide and, using those pulmonary function testing results in conjunction with Dr. Britton's report, they were now proceeding under the safety valve provision in section 90.010(f)(1). They also requested a full evidentiary hearing as required by section 90.010(g) for claimants proceeding under the safety valve provision. The court granted the Emmites' request for an evidentiary hearing and also granted Union

---

[5] To comply with the "safety valve" provision a claimant must serve a report that:

    (A) complies with the requirements of Sections 90.003(a)(2)(A), (B), (E), and (F) and 90.003(b) or Sections 90.004(a)(1), (2), and (4) and 90.004(e); and

    (B) verifies that:

        (i) the physician making the report has a physician-patient relationship with the exposed person;

        (ii) pulmonary function testing has been performed on the exposed person and the physician making the report has interpreted the pulmonary function testing;

        (iii) the physician making the report has concluded, to a reasonable degree of medical probability, that the exposed person has radiographic, pathologic, or computed tomography evidence establishing bilateral pleural disease or bilateral parenchymal disease caused by exposure to asbestos or silica; and

        (iv) the physician has concluded that the exposed person has asbestos-related or silica-related physical impairment comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003 or 90.004.

*Id.* § 90.010(f)(1).

Carbide's request to depose Dr. Suzanne McClure, the doctor who signed Joseph's death certificate. The evidentiary hearing was deferred until after the deposition.

Dr. McClure was injured in an automobile accident and Union Carbide was unable to depose her until September 2009. After taking her deposition, Union Carbide renewed its motion to dismiss. The Emmites responded by arguing that the renewed motion was untimely and Union Carbide waived its right to seek dismissal by engaging in discovery after the previous hearing. They also attached a report dated October 28, 2009, from Dr. Joseph Prince, a pulmonologist who treated Joseph just before he died. The Emmites asserted that Dr. Prince's report complied with the safety valve requirements.

The trial court held a fourth hearing in November 2009 to address the renewed motion to dismiss. Following that hearing, but before the court ruled, the Emmites filed an amended version of Dr. Prince's report. In the amended report Dr. Prince explained that he served as Joseph's treating physician immediately before his death, he had reviewed Joseph's medical records and occupational and exposure histories, and he opined that (1) Joseph had pulmonary asbestosis, (2) Joseph's debilitated state would have made pulmonary function testing difficult, and (3) Joseph had asbestos-related impairment comparable to the criteria in Chapter 90. In December 2009, the trial court held a fifth hearing, following which it signed an order denying Union Carbide's motion to dismiss.[6]

---

[6] In support of its ruling, the MDL court found that:
(1) Joseph worked as an insulator for approximately 39 years at the Union Carbide Texas City facility;
(2) The autopsy findings revealed asbestosis that had resulted in severe pulmonary fibrosis and the cause of death was the combined effects of retained asbestos fibers;
(3) Texas Civil Practice and Remedies Code sections 90.003 and 90.004 do not adequately assess Joseph's pulmonary impairment due to physical and mental limitations from which he suffered;

6

Union Carbide filed an interlocutory appeal from the denial of its motion to dismiss. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(11). On appeal it asserted that the trial court abused its discretion by considering reports and evidence other than the initial reports of Drs. Kradin and Britton because the Emmites neither moved for nor showed good cause for an extension of time to file additional reports. It also contended that even if the trial court properly considered the later-filed report of Dr. Prince, that report failed to comply with the safety valve requirements because Joseph's pulmonary function test results did not show that he had pulmonary function impairment, Dr. Prince testified that the tests were normal, and Dr. Prince did not utilize the test results in reaching his conclusion that Joseph demonstrated pulmonary impairment. The Emmites argued that the court of

(4) Shortly before his death Joseph suffered from physical and mental limitations, which made it impossible for him to take a pulmonary function test;

(5) Had Joseph been physically and mentally capable of performing a pulmonary function test, the results would have demonstrated pulmonary impairment greater than that required under Texas Civil Practice and Remedies Code section 90.003;

(6) Due to Joseph's physical and mental limitations, severe asbestosis, and death, the medical criteria set forth in Texas Civil Practice and Remedies Code section 90.003 do not adequately assess Joseph's physical impairment caused by exposure to asbestos;

(7) Dr. Prince is a qualified, board-certified pulmonary specialist who served Joseph as his last treating physician;

(8) In his report and testimony, Dr. Prince verified that pulmonary function testing had been previously performed on Joseph, and that he interpreted the results;

(9) Other than cross-examination of Dr. Prince at his deposition, Union Carbide offered no evidence, either by way of live expert testimony, depositions, or fact witnesses to contradict the findings of Dr. Prince;

(10) Dr. Prince had no history of working as a litigation consultant. The testimony and opinions offered by Dr. Prince were at all times credible, reliable and uncontroverted;

(11) Joseph's case presents unique and extraordinary physical and medical characteristics justifying denial of Union Carbide's Motion to dismiss;

(12) Joseph's family produced sufficient credible evidence to allow a finder of fact to reasonably find that his asbestos impairment was comparable to the impairment that an exposed person would have had if the exposed person met the criteria set forth in section 90.003.

7

appeals did not err in considering all of the evidence presented throughout the pretrial process, that Dr. Prince's report was fully compliant with the requirements of section 90.010(f)(1), and if that section imposed a requirement of pulmonary function testing demonstrating pulmonary impairment, it violated the Texas Constitution's prohibition against retroactive laws as it applied to them.

In an en banc decision on rehearing, the court of appeals held that the MDL court properly considered all of the Emmites' physician reports, section 90.010(f)(1) requires pulmonary function testing to have been performed on the person allegedly injured, and the testing must have been relevant to the physician's diagnosis of functional pulmonary impairment. *Union Carbide Corp. v. Synatzske*, 386 S.W.3d 278, 307 (Tex. App.—Houston [1st Dist.] 2012, pet. granted). After noting that Dr. Prince testified that he did not use Joseph's pulmonary testing results in reaching his diagnosis, the appeals court concluded that his report did not satisfy the requirements of section 90.010(f)(1)(B)(ii). *Id.* at 297. Then, referencing *Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126 (Tex. 2010), the court held that as applied to the Emmites' claims, section 90.010(f)(1)(B)(ii) violated the Texas Constitution's prohibition against retroactive laws. *Id.* at 307.

We begin by reviewing the relevant provisions of Chapter 90.

## II. Civil Practice and Remedies Code Chapter 90

As noted previously, Chapter 90 of the Texas Civil Practice and Remedies Code was enacted by the 79th Legislature in 2005, signed by the Governor in May 2005, and became effective on September 1 of that year. Act of May 16, 2005, 79th Leg., R.S., ch. 97, § 1, 2005 Tex. Gen. Laws 169; *see* TEX. CIV. PRAC. & REM. CODE §§ 90.001–012. By enacting Chapter 90, the Legislature sought to address an asbestos litigation crisis which it found was "costly to employers, employees,

8

litigants, and the court system." Act of May 16, 2005, 79th Leg., R.S., ch. 97, § 1(d), (h), 2005 Tex.

Gen. Laws 169. The Legislature's stated purpose in enacting the legislation was to protect

> the right of people with impairing asbestos-related . . . injuries to pursue their claims for compensation in a fair and efficient manner through the Texas court system, while at the same time preventing scarce judicial and litigant resources from being misdirected by the claims of individuals who have been exposed to asbestos . . . but have no function or physical impairment from asbestos-related . . . disease.

*Id.* § 1(n). To accomplish its purpose, the Legislature

> (1) adopt[ed] medically accepted standards for differentiating between individuals with nonmalignant asbestos-related . . . disease causing functional impairment and individuals with no functional impairment;
> (2) provided a method to obtain the dismissal of lawsuits in which the exposed person has no functional impairment, while at the same time protecting a person's right to bring suit on discovering an impairing asbestos-related . . . injury; and
> (3) creat[ed] an extended period before limitations begin to run in which to bring claims for injuries caused by the inhalation or ingestion of asbestos . . . to preserve the right of those who have been exposed to asbestos . . . but are not yet impaired to bring a claim later in the event that they develop an impairing asbestos-related . . . injury.

*Id.*

Chapter 90 created physician report requirements for claimants. TEX. CIV. PRAC. & REM.

CODE §§ 90.003, 90.010(f)(1). Section 90.003 requires claimants suing for non-cancerous, asbestos-

related injuries to serve each defendant with a detailed occupational and exposure history, a detailed

medical and smoking history of the exposed person, and a physician's report which includes a

verification that the physician conducted a detailed physical examination. *Id.* §§ 90.003(a)(2)(A),

90.003(b).[7] The report must include the details of those histories and verify that ten years have

---

[7] Section 90.003(a)(2) requires a claimant asserting a non-cancerous, asbestos-related injury claim to serve each defendant with

> (2) a report by a physician who is board certified in pulmonary medicine, internal medicine, or

elapsed between the initial exposure and the physician's diagnosis. *Id.* § 90.003(a)(2)(B). Section

90.003 also requires the physician's report to verify that the exposed person has a statutorily

occupational medicine and whose license and certification were not on inactive status at the time the report was made that:

> (A) verifies that the physician or a medical professional employed by and under the direct supervision and control of the physician:
>> (i) performed a physical examination of the exposed person, or if the exposed person is deceased, reviewed available records relating to the exposed person's medical condition;
>> (ii) took a detailed occupational and exposure history from the exposed person or, if the exposed person is deceased, from a person knowledgeable about the alleged exposure or exposures that form the basis of the action; and
>> (iii) took a detailed medical and smoking history that includes a thorough review of the exposed person's past and present medical problems and their most probable cause;
>
> (B) sets out the details of the exposed person's occupational, exposure, medical, and smoking history and verifies that at least 10 years have elapsed between the exposed person's first exposure to asbestos and the date of diagnosis;
>
> (C) verifies that the exposed person has:
>> (i) a quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification as showing:
>>> (a) bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/1 or higher, for an action filed on or after May 1, 2005;
>>> (b) bilateral small irregular opacities (s, t, or u) with a profusion grading of 1/0 or higher, for an action filed before May 1, 2005; or
>>> (c) bilateral diffuse pleural thickening graded b2 or higher including blunting of the costophrenic angle; or
>>
>> (ii) pathological asbestosis graded 1(B) or higher under the criteria published in "Asbestos-Associated Diseases," 106 Archives of Pathology and Laboratory Medicine 11, Appendix 3 (October 8, 1982);
>
> (D) verifies that the exposed person has asbestos-related pulmonary impairment as demonstrated by pulmonary function testing showing:
>> (i) forced vital capacity below the lower limit of normal or below 80 percent of predicted and FEV1/FVC ratio (using actual values) at or above the lower limit of normal or at or above 65 percent; or
>> (ii) total lung capacity, by plethysmography or timed gas dilution, below the lower limit of normal or below 80 percent of predicted;
>
> (E) verifies that the physician has concluded that the exposed person's medical findings and impairment were not more probably the result of causes other than asbestos exposure revealed by the exposed person's occupational, exposure, medical, and smoking history; and
>
> (F) is accompanied by copies of all ILO classifications, pulmonary function tests, including printouts of all data, flow volume loops, and other information demonstrating compliance with the equipment, quality, interpretation, and reporting standards set out in this chapter, lung volume tests, diagnostic imaging of the chest, pathology reports, or other testing reviewed by the physician in reaching the physician's conclusions.

TEX. CIV. PRAC. & REM. CODE § 90.003(a)(2).

specified threshold level of asbestos-related functional pulmonary impairment as demonstrated by pulmonary function testing. *Id.* § 90.003(a)(2)(D). The statute specifies a threshold level of impairment by requiring the pulmonary function testing to demonstrate that the exposed person has

> forced vital capacity below the lower limit of normal or below 80 percent of predicted and FEV1/FVC ratio (using actual values) at or above the lower limit of normal or at or above 65 percent; or total lung capacity, by plethysmography or timed gas dilution, below the lower limit of normal or below 80 percent of predicted.

*Id.* § 90.003(a)(2)(D).[8] Further, the report must verify that the medical findings and impairment were not more likely the result of causes other than asbestos exposure, as well as include copies of all the test results and other medical documents the physician relied upon in reaching the physician's medical conclusions. *Id.* § 90.003(a)(2)(E)-(F). In the event a claimant's pulmonary function test results do not meet the requirements of section 90.003(a)(2)(D)(i) or (ii), section 90.003(c) permits the required physician's report to use different criteria for verifying that the exposed person has restrictive impairment from asbestosis. *Id.* § 90.003(c). But under that section the physician still must identify the specific pulmonary function test findings on which the physician relies to establish that the exposed person has restrictive functional impairment. *Id.* § 90.003(c)(3).

Chapter 90 includes an alternative safety valve impairment provision for situations in which an exposed person can demonstrate asbestos-related impairment, but cannot satisfy the criteria in section 90.003. *See id.* § 90.010(f)(1),(j). The safety-valve provision applies "only in exceptional

---

[8] "FEV1" means forced expiratory volume in the first second, which is the maximal volume of air expelled in one second during performance of simple spirometric tests. TEX. CIV. PRAC. & REM. CODE § 90.001(9). "FVC" means forced vital capacity, which is the maximal volume of air expired with maximum effort from a position of full inspiration. *Id.* § 90.001(10). "Plethysmography" means the test for determining lung volume, also known as "body plethysmography," in which the subject of the test is enclosed in a chamber that is equipped to measure pressure, flow, or volume change. *Id.* § 90.001(22).

11

and limited circumstances." *Id.* Section 90.010(f) mandates a physician report demonstrating the physician considered the individual physical, occupational, and medical history requirements of the person allegedly injured by asbestosis, and also requires the physician to rule out non-asbestos causes and include all appropriate documentation. *Id.* §§ 90.003(a), 90.010(f)(1)(A). A safety-valve physician report must also show that

> (i) the physician making the report has a physician-patient relationship with the exposed person;
> (ii) *pulmonary function testing has been performed on the exposed person and the physician making the report has interpreted the pulmonary function testing*;
> (iii) the physician making the report has concluded, to a reasonable degree of medical probability, that the person has radiographic, pathologic, or computed tomography evidence establishing bilateral pleural disease or bilateral parenchymal disease caused by exposure to asbestos or silica; and
> (iv) the physician has concluded that the exposed person has asbestos-related . . . physical impairment comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003.

*Id.* § 90.010(f)(1)(B) (emphasis added).

There are additional requirements for claimants proceeding under section 90.010(f): the MDL court must find that

> (A) the report and medical opinions offered by the claimant are reliable and credible;
> (B) due to unique or extraordinary physical or medical characteristics of the exposed person, the medical criteria set forth in Section[] 90.003 do[es] not adequately assess the exposed person's physical impairment caused by exposure to asbestos . . . ; and
> (C) the claimant has produced sufficient credible evidence for a finder of fact to reasonably find that the exposed person is physically impaired as the result of exposure to asbestos . . . to a degree comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003.

*Id.* § 90.010(f)(2). The MDL court must permit a reasonable time for discovery and conduct an evidentiary hearing before considering whether the requirements of section 90.010(f)(2) have been

12

met. *Id.* § 90.010(g). The court is required to make written findings and to specifically identify "(1) the unique or extraordinary physical or medical characteristics of the exposed person that justify the application of this section; and (2) the reasons the criteria set forth in Section[] 90.003 . . . do not adequately assess the exposed person's physical impairment caused by exposure to asbestos." *Id.* § 90.010(h).

Chapter 90 imposes timing requirements for claimants to serve the required physician reports as well as a procedural structure for defendants to move for dismissal if a compliant report is not filed. A claimant proceeding under section 90.003 must serve the defendant with a compliant report not later than thirty days after the defendant's answer or appearance. *Id.* § 90.006(a). If the claimant either fails to serve any report or serves a report that does not comply with section 90.003, a defendant may, within thirty days of being served (or if no report was served, within thirty days of the date the report was due), file a motion to dismiss. *Id.* § 90.007(a). A claimant may then respond within fifteen days by either filing a compliant report or amending a previously filed but non-compliant report. *Id.* § 90.007(b).

If the court determines that the motion to dismiss is meritorious, dismissal by written order is mandatory, "except as provided by section 90.010(d) or (e)." *Id.* § 90.007(c). Section 90.010(e) in turn requires dismissal for failure to serve a report that complies with section 90.003 unless the claimant meets the safety valve provisions. *Id.* § 90.010(e). The court is also permitted, "on the motion of a party showing good cause," to alter the timing requirements for serving motions, responses, or reports. *Id.* § 90.007(e).

13

As is readily apparent from the foregoing in Chapter 90, the Legislature focused on physical, functional impairment and sought to preserve resources for those persons who could demonstrate such impairment due to asbestos exposure. Act of May 16, 2005, 79th Leg., R.S., ch. 97, § 1(n), 2005 Tex. Gen. Laws 169, 170. To achieve this goal it adopted medically accepted standards for differentiating between individuals with nonmalignant asbestos-related disease causing functional pulmonary physical impairment and individuals exposed to asbestos but who did not have such impairment. *Id.* The Legislature selected functional pulmonary impairment as the dividing line between those who could pursue asbestos-related injury claims[9] and those who could not. In order to establish an objectively determinable distinction between the two types of claimants, it mandated a "medically accepted standard"—pulmonary function testing—as a key component of the required physician report. *See* TEX. CIV. PRAC. & REM. CODE §§ 90.001(23), 90.003(a)(2)(D), 90.003(a)(2)(c), 90.010(f)(1)(B)(ii).

Having reviewed the statutory construct, we move to the merits. We begin by considering whether the Emmites timely filed physician reports.

### III. Timeliness of the Reports

Union Carbide argues that the trial court erred by considering any of the Emmites' reports other than the two reports filed before the September 14, 2007 hearing. We disagree.

Union Carbide does not dispute the timeliness of the physician reports of Dr. Kradin, attached to the Emmites' original petition, or the initial report of Dr. Britton, served in response to

---

[9] "Asbestos-related injury" means personal injury or death allegedly caused, in whole or in part, by inhalation or ingestion of asbestos. *Id.* § 90.001(2).

14

Union Carbide's initial motion to dismiss. Rather, it argues that any further reports were untimely because they were filed more than fifteen days after the motion to dismiss was filed, and the Emmites never moved for an extension of time. *See id.* §§ 90.007(b), (e).

Union Carbide's initial motion to dismiss was premised on the lack of a report meeting section 90.003(a)'s requirements. As previously noted, the trial court orally denied the motion, but did not sign a written order. And because the court ruled in their favor, the Emmites had no reason to move for an extension of time or to supplement their physician reports.

In its motion for reconsideration, Union Carbide argued, among other things, that the absence of references to pulmonary function testing in the Emmites' physician reports made them non-compliant with both section 90.003 and the alternative safety valve requirements of section 90.010(f)—the section the pretrial court relied upon when it orally denied Union Carbide's motion to dismiss. At the November 2007 hearing on Union Carbide's motion to reconsider, the Emmites asserted they were still proceeding under section 90.003, reiterated their contention that the pulmonary function testing requirements of Chapter 90 were inapplicable in a death case, and notified the court that they were attempting to have Joseph's death certificate amended so asbestosis would be listed as a cause of death. The court granted them six weeks to do so, and indicated that it would make its ruling on Union Carbide's motion to reconsider and the underlying motion to dismiss based on the outcome of the Emmites' attempt to have the death certificate amended.

The Emmites argue, and the en banc court of appeals held, that the Emmites' request for leave to seek amendment of Joseph's death certificate amounted to a motion to extend Chapter 90's time limits for serving reports. 386 S.W.3d at 290; *see* TEX. CIV. PRAC. & REM. CODE § 90.007(e).

15

The en banc court held that the pretrial court necessarily inferred both such a motion and good cause to support the extension by allowing the Emmites six weeks to seek the amendment. 386 S.W.3d at 290-91. Union Carbide responds that no motion was made, good cause could not have been shown because the reports were incurable under section 90.003(a)(2)(D)'s pulmonary function testing requirement, and the trial court erred in allowing the Emmites additional time.

We need not address the question of whether a motion to extend time existed and whether it was supported by good cause because Union Carbide did not secure a written ruling on either its motion for reconsideration or the underlying motion to dismiss, nor did it object to the trial court's failure to sign a written order. Thus, both motions remained pending before the MDL court. In January 2008, while Union Carbide's motion to reconsider was still awaiting resolution, the Emmites again served Union Carbide with Dr. Britton's report and for the first time affirmatively invoked the safety valve provisions of section 90.010(f)(1). Then, at the January 18, 2008 hearing, the Emmites asserted that Dr. Britton's report complied with the safety valve requirements and requested the full evidentiary hearing required by section 90.010(g). As we explain below, because the Emmites elected to proceed under section 90.010(f) at a time when the court had not ruled on Union Carbide's motions to dismiss and for reconsideration, and because the timing requirements that apply to a section 90.003 report do not apply to a section 90.010(f) report, the trial court did not err by considering the Emmites' 90.010(f) reports and other evidence it later offered.

In construing a statute our primary objective is to ascertain the Legislature's intent, and we do that, if possible, through the words the Legislature selected. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). We derive the Legislature's intent from the statute as a whole, not

16

by reading individual provisions in isolation. *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 454 (Tex. 2012).

Section 90.007(a) outlines the procedure for moving for dismissal for failure to timely serve a report that complies with section 90.003. TEX. CIV. PRAC. & REM. CODE § 90.007(a). That provision invokes the timing requirements of section 90.006, but makes no reference to reports filed pursuant to the safety valve provisions in section 90.010(f)(1). *See id.* The timing requirements outlined in section 90.006 refer to reports served pursuant to section 90.003, but similarly to the dismissal provisions in section 90.007, do not make reference to reports served under the safety valve provisions in section 90.010(f)(1). *See id.* § 90.006. If the trial court finds a section 90.007(a) motion to dismiss to be meritorious, it must dismiss the claim "except as provided by" section 90.010(e). *Id.* § 90.007(c). Section 90.010(e) mandates dismissal unless the claimant serves a report that complies with section 90.010(f)(1) and the court, on motion and after a hearing, makes the findings required by section 90.010(f)(2). *Id.* § 90.010(e). Thus, section 90.010(e) necessarily contemplates that a section 90.003 compliant report has not been served on the defendant, and at the same time provides a method for a claimant to avoid dismissal of the claim by serving a report that complies with the alternative safety valve requirements, which in turn requires an evidentiary hearing and factual findings by the court. *See id.* § 90.010(e). Section 90.010(e) does not mention a timing requirement for the hearing or findings. *See id.*

Among the findings a court must make under section 90.010(f)(2) is that the exposed person has impairment comparable to the impairment criteria set forth in section 90.003. *See id.* § 90.010(f)(2)(c). Section 90.010(g) further requires the section 90.010(f)(2) findings to be made

after an evidentiary hearing at which both parties may offer evidence and also requires a reasonable opportunity to conduct discovery before that hearing. *Id.* § 90.010(g). Section 90.010 thus necessarily expands the MDL court's inquiry beyond the issue of whether a report that complies with section 90.003 has been timely served on the defendant. And although Union Carbide argues that a two-year discovery period is not reasonable and defeats the purposes of Chapter 90, the factual situation here explains the delay.

It follows that because the Emmites invoked the safety valve provisions of section 90.010(f) at a time when the court was still considering Union Carbide's motion for reconsideration and motion to dismiss, they could introduce additional evidence and reports for the trial court to consider. Accordingly, the MDL court did not abuse its discretion by considering all of the Emmites' physician reports and evidence.

We now turn to the issue of whether Dr. Prince's report complied with the safety valve requirements of section 90.010(f)(1).

## IV. Compliance with Section 90.010(f)(1)

In lieu of pulmonary function testing demonstrating a specified threshold of functional impairment, the safety valve provisions in section 90.010(f) require pulmonary function testing to have been performed on the exposed person and the physician making the report to have interpreted that testing. TEX. CIV. PRAC. & REM. CODE § 90.010(f)(1)(B)(ii). The only pulmonary testing performed on Joseph occurred before he retired from Union Carbide in 1979 and that testing did not show functional pulmonary impairment. As the court of appeals noted, neither the Emmites nor Dr. Prince rely upon the testing to show that Joseph suffered from asbestos-related functional pulmonary

18

impairment while he was alive, or that he died as a result of his exposure to asbestos. 386 S.W.3d at 296.

The Emmites contend section 90.010(f) requires only that testing was performed and that the reporting physician interpreted the tests, not that the tests were relevant to the physician's diagnosis of functional pulmonary impairment by showing some level of functional impairment or otherwise playing some part in the physician's diagnosis. They argue that the forty-year-old tests satisfy section 90.010(f)(1)(B)(ii) even though Dr. Prince testified the tests were normal and he did not rely on them in diagnosing Joseph as having had functional pulmonary impairment. We disagree.

As previously noted, our primary objective in construing a statute is to give effect to the Legislature's intent. *City of Rockwall*, 246 S.W.3d at 625. We derive the Legislature's intent from the statute as a whole, not from individual provisions in isolation. *Ruttiger*, 381 S.W.3d at 454. We construe a statute's words according to their plain and common meaning unless they are statutorily defined otherwise, a different meaning is apparent from the context, or unless such a construction leads to absurd results. *See Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). We take statutes as we find them, presuming the Legislature included words that it intended to include and omitted words it intended to omit. *See, e.g.*, *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010). We do not read words into a statute to make it what we consider to be more reasonable, rather we may do so only to prevent an absurd result. *Id.* at 930.

The language of section 90.010(f)(1)(B)(ii) does not expressly require that the pulmonary function test show functional impairment or otherwise be relevant to the physician's diagnosis of asbestos-related functional pulmonary impairment. *See* TEX. CIV. PRAC. & REM. CODE

19

§ 90.010(f)(1)(B)(ii). But in comparing that section to section 90.003, we note the Legislature retained pulmonary function testing as a requirement in section 90.010(f)(1) while omitting other objective criteria. That indicates that the Legislature expected pulmonary function testing to play a key role in the physician's diagnosis. Comparison of the two sets of requirements provides context for the role each provision plays. And, it is clear that both in context and in order to avoid nonsensical, absurd results, section 90.010(f)(1) must be read to require pulmonary function testing and its results to be relevant to the reporting physician's medical conclusions.

First, as to context, section 90.010(f)(1), unlike section 90.003, does not require specific x-ray readings, but instead simply requires the physician to conclude that the radiographic and other evidence establishes that the exposed person had asbestos-related disease. *Compare id.* § 90.003(a)(2)(c), *with* § 90.010(f)(1)(iii). However, while section 90.010(f)(1) omits a minimum threshold showing, by way of pulmonary function testing, that either the exposed person's (1) forced vital capacity, or (2) total lung capacity, falls below a statutorily set level of pulmonary impairment, section 90.010(f)(1) still requires that pulmonary function testing has been performed and that the reporting physician has interpreted that testing. *Compare id.* § 90.010(f)(1), *with* § 90.003(a)(2)(D). By specifically retaining pulmonary function testing in the safety valve provisions while omitting other requirements, the Legislature singled out pulmonary function testing as a paramount consideration in a physician's medical conclusions, and not merely an inconsequential procedural hurdle.

A section 90.010(f)(1) report must include a detailed medical, occupational, and exposure history. *Id.* § 90.010(f)(1)(A) (incorporating the requirements from section 90.003(a)(2)(A)-(B)).

20

The reporting physician must rule out causes of functional impairment other than asbestos exposure. *Id.* (incorporating the requirements from section 90.003(a)(2)(E)). And a section 90.010(f)(1) report must include copies and documentation of all testing, including pulmonary function testing, that the physician reviewed in reaching the physician's conclusions. *Id.* (incorporating the requirements from section 90.003(a)(2)(F)). By requiring copies of all pulmonary function tests reviewed by the physician in reaching his conclusions, as well as requiring pulmonary function testing to have been performed, the Legislature indicated that the pulmonary function testing must play a role in the physician's medical conclusions under the safety valve. *Id.* § 90.010(f)(1).

Moreover, absent the pulmonary function test required by section 90.010(f) being relevant to the diagnosis of functional pulmonary impairment, the safety valve requirement would yield results completely at odds with the rest of Chapter 90's testing requirements by permitting claims to go forward based on the fortuity of pulmonary testing having occurred sometime in the exposed person's past—as with Joseph's pulmonary tests—but not requiring the testing to be relevant to any diagnosis of impairment, while the other testing requirements in Chapter 90 are required to be relevant to the diagnosis of pulmonary functional impairment. The associated result would be that persons with asbestosis but no pulmonary function test in their past will be precluded from pursuing claims because they never underwent testing—even though such a test might have been completely irrelevant to a diagnosis of asbestos-related pulmonary function impairment. If the required testing is sufficient absent any relationship to the diagnosis, the requirement might just as well be some other non-relevant accomplishment or event such as requiring the exposed person to have been born on a particular day of the week. We do not attribute to the Legislature an intent that Chapter 90, with

21

its detailed processes and procedures, should yield such a nonsensical, arbitrary result. The Legislature's stated purpose was to preserve and allocate limited resources for compensating persons impaired by asbestosis, not to arbitrarily deny compensation to persons with asbestosis.

Thus, in order to interpret the pulmonary function testing requirement in the safety valve provision in a manner that contextually meshes with the remainder of Chapter 90, and yields non-arbitrary, non-absurd results, we are compelled to conclude that the Legislature intended that the testing have some relevance to the physician's diagnosis of asbestos-related pulmonary impairment, such as by showing some level of pulmonary impairment, even though the testing results do not meet the section 90.003 threshold. Reading the statute otherwise would ignore the Legislature's purpose in enacting Chapter 90, which was to respond to the asbestosis litigation crisis that was in large part the result of lawsuits filed by persons who had been exposed to asbestos and may even have had asbestos-related physical changes, but who had not developed asbestos-related physical *impairment*. Act of May 16, 2005, 79th Leg., R.S., ch. 97, § 1(f), (n), 2005 Tex. Gen. Laws 169, 169-70.

In his dissent, Justice Boyd argues that the pulmonary function testing requirement in section 90.010(f) requires only that testing has been performed—regardless of its timing, results, or relevance to the physician's medical conclusions—because the existence of past testing establishes the claimant was concerned enough about asbestos exposure to have testing performed at some point. But nothing in this record or the legislative findings supports that position: the Emmites do not contend that pulmonary function tests are administered only to determine if persons have asbestos-related pulmonary impairment. Even if they did, their position would not account for pulmonary function tests administered for purposes completely unrelated to possible asbestos-caused pulmonary

injury, such as pre-employment physical examinations, athletic physical examinations, and certain military physical examinations.

Justice Boyd also argues that it is unnecessary for the safety valve's pulmonary function test to be relevant to the physician's diagnosis of pulmonary function impairment because of the other safety valve requirements. But if the required pulmonary function test is inconsequential as to the determination of functional pulmonary impairment, then there is no need for it to be part of the safety valve requirements at all. Chapter 90 is too detailed and carefully constructed to achieve the Legislature's specified purpose—preserving scarce assets for those who have functional pulmonary impairment—to attribute to the Legislature an intent for the statute to contain a random, inconsequential, arbitrary hurdle for claimants to overcome.

Finally, Justice Boyd speculates that legislators might have made a mistake and simply missed adding the requirement to the safety valve section that the pulmonary function test must demonstrate some impairment or other relevance to a physician's diagnosis of functional pulmonary impairment. And they may have. But we presume legislators intended to enact legislation fulfilling their clearly stated purpose rather than presuming they made a mistake that both diminishes the result they were seeking to obtain as well as arbitrarily distinguishing among persons claiming asbestos-related impairment.

In sum, applying the construction urged by the Emmites would result in the statute at least partially failing its intended purpose, and would attribute to the Legislature an intent to require pulmonary function testing and interpretation of that testing as a meaningless, arbitrary procedural hurdle instead of an objective method for differentiating between persons exposed to asbestos and

who have functional pulmonary impairment from that exposure and those exposed to asbestos but who have no functional impairment from it. *See* TEX. CIV. PRAC. & REM. CODE §§ 90.003(c)(3), 90.001(23), 90.010(f)(1); *see also* Act of May 16, 2005, 79th Leg., R.S., ch. 97, § (n), 2005 Tex. Gen. Laws 169, 170. And we presume the Legislature does not impose meaningless requirements as part of its lawmaking function. *Tex. Lottery Comm'n*, 325 S.W.3d at 635.

We conclude that forty-year-old tests that do not show some level of functional pulmonary impairment, or are not otherwise relevant to the diagnosis of functional pulmonary impairment, do not fulfill the requirements of section 90.010(f)(1)(B)(ii). Dr. Prince's report does not satisfy section 90.010(f)(1), and the statute requires dismissal of the Emmites' claims.

Our conclusion that section 90.010(f)(1)(B)(ii) mandates dismissal of the Emmites' claims leads to the question of whether, as they urge in the alternative, the section is unconstitutionally retroactive as applied to them. *See* TEX. CONST. art. I, § 16.

## V. Constitutionality of Section 90.010(f)(1)(B)(ii)

### A. Retroactivity Generally

The Texas Constitution provides that "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." TEX. CONST. art. I, § 16. We have defined a retroactive law as "a law that acts on things which are past." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002). Chapter 90 changed the procedures and standards for the Emmites to pursue their statutory cause of action for wrongful death after it had accrued, so the statute's effect was retroactive as to their claims. *See Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 348 (Tex. 1992) (a wrongful death cause of action accrues at the death of the

24

injured person); *see also* TEX. CIV. PRAC. & REM. CODE § 16.003(b).  But retroactive effect alone will not make a statute unconstitutional.  *See Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 139 n.67 (Tex. 2010) (citing *Tex. Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648 (Tex. 1971)).  We begin, as we do with any challenge to a statute's constitutionality, by presuming that the statute is constitutional.  *See Walker v. Gutierrez*, 111 S.W.3d 56, 66 (Tex. 2003).  And the burden of demonstrating a statute is unconstitutional is on the party challenging it.  *Id.*

Union Carbide notes that because a wrongful death cause of action is purely statutory, its legislative restriction does not violate the open courts provision of the Texas Constitution.  *See Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 355-56 (Tex. 1990).  It then reasons that if the Legislature may restrict statutory causes of action without violating the open courts provision of the Texas Constitution, it may also restrict them without implicating the constitutional prohibition against retroactive laws.  But our test for violation of the open courts provision applies only to common law causes of action and addresses different concerns than the prohibition on retroactive laws.  *See id.*; *see also* TEX. CONST. art. I, § 13.  We have noted that retroactive effects of a statute on common law and statutory causes of action present "different considerations" in the retroactivity context.  *See Robinson*, 335 S.W.3d at 135-36.  But we have never held that statutory causes of action are categorically beyond the constitutional protections from retroactive laws.  Nor do we do so today.  Rather, we apply the framework for retroactivity analysis we adopted in *Robinson*.  And because the analysis we set out in *Robinson* guides our way, we briefly review that case.

In *Robinson*, Barbara and John Robinson sued Crown Cork & Seal, the successor to John's former employer, alleging that John contracted mesothelioma due to asbestos exposure.  *Id.* at 129.

25

After the lawsuit had proceeded to the discovery stage, the Legislature enacted Chapter 149 of the Texas Civil Practice and Remedies Code which altered the choice of law rules in successor-liability asbestos cases. *Id.* at 130. The statute functioned to absolve Crown Cork & Seal of liability for John's mesothelioma and barred the Robinsons' claims. *Id.* at 132-33. The trial court granted summary judgment to Crown Cork & Seal based on Chapter 149's limitation of liability. *Id.* at 133. The Robinsons appealed, arguing that Chapter 149 was a retroactive law in violation of the Texas Constitution. *Id.*

We determined that classifying a right or interest as "vested" in order to determine whether it has been retroactively diminished or impaired in violation of the constitution has not yielded an efficient and predictable framework. *See id.* at 145 ("Robinson's argument that [three different rights] are somehow vested differently for purposes of determining unconstitutional retroactivity establishes the fundamental failure of the 'impairs vested rights' test."). After extensively reviewing our jurisprudence concerning the 'vested rights' analysis as to retroactivity and noting its shortcomings, we explained that

> [O]ur cases establish that the constitutional prohibition against retroactive laws does not insulate every vested right from impairment, nor does it give way to every reasonable exercise of the Legislature's police power; *it protects settled expectations that rules are to govern the play and not simply the score, and prevents the abuses of legislative power that arise when individuals or groups are singled out for special reward or punishment.* No bright-line test for unconstitutional retroactivity is possible. Rather, in determining whether a statute violates the prohibition against retroactive laws in article I, section 16 of the Texas Constitution, *courts must consider three factors in light of the prohibition's dual objectives: the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; the nature of the prior right impaired by the statute; and the extent of the impairment.* The perceived public advantage of a retroactive law is not simply to be balanced against its relatively small impact on private interests, or the

26

> prohibition would be deprived of most of its force. There must be a compelling public interest to overcome the heavy presumption against [the validity of] retroactive laws.

*Id.* at 145-46 (emphasis added) (citations omitted). After clarifying the framework for determining whether a statute is unconstitutionally retroactive, we applied the three factors we enumerated to the facts of the case.

Addressing the nature of the right impaired and the extent of that impairment, we first recognized that although it did so indirectly, Chapter 149 extinguished the Robinsons' common law claims. *Id.* at 148. We also recognized that the Robinsons' claims had matured, discovery in the case showed the claim was substantially based in fact, and recovery was predictable. *Id.* We further noted the Robinsons' reasonable, settled expectation that the rule of law permitting their recovery would not be altered after they had already filed and proceeded with their lawsuit. *Id.* Thus we concluded that Chapter 149 had the effect of abrogating the Robinsons' claims and benefitting Crown Cork & Seal. *Id.* at 149.

Turning to the public interest served, we noted that Chapter 149 contained no legislative findings and was apparently enacted to benefit Crown Cork & Seal and no one else. *Id.* We held that the public interest served—reduction of one corporation's liability—was slight. *Id.* at 149-50. Given the minimal public interest served and the grave impact on the Robinsons' right to recover, we held Chapter 149 to be unconstitutionally retroactive. *Id.* at 150.

### B. Chapter 90 as Applied to the Emmites

### 1. Nature and Strength of the Public Interest Served

The Emmites assert that requiring them to show Joseph had a pulmonary function test showing impairment as a prerequisite for maintaining their claim does not serve a compelling public interest. They say that, as applied to them, only Union Carbide would benefit from imposition of the requirement—an improper legislative abuse of power prohibited by the Constitution. We disagree.

To overcome the presumption that laws with retroactive effects are unconstitutional, the public interest a statute serves must be compelling. *Id.* at 146. The statute in *Robinson* was ostensibly enacted for the sole benefit of Crown Cork & Seal. *Id.* The only public benefit achieved by the statute was the reduction of Crown Cork & Seal's liability due to asbestos litigation—a benefit we declined to find sufficiently compelling to overcome the presumption that retroactive laws are unconstitutional. *See id.* at 149. But the statutory provision at issue here stands in stark contrast to the one we addressed in *Robinson*. The Legislature provided extensive findings to support Chapter 90's enactment and its effects. Act of May 16, 2005, 79th Leg., R.S., ch. 97, § 1, 2005 Tex. Gen. Laws 169. Those findings identified a litigation crisis in which more asbestos-related suits were filed in Texas than in any other state, negatively affecting the financial resources available for compensating persons with asbestos-related injuries and the judicial resources available for allocating those financial resources. *Id.* § 1(d), (e). The findings in part attributed the crisis to lawsuits filed by persons who had been exposed to asbestos, but who were not suffering from asbestos-related impairment. *Id.* § 1(f). The Legislature noted the onslaught of asbestos litigation had negative effects on employers, employees, and the court system. *Id.* § 1(g). Because of those effects, the Legislature acted

28

to protect the right of people with *impairing* asbestos-related and silica-related injuries to pursue their claims for compensation in a fair and efficient manner through the Texas court system, while at the same time preserving scarce judicial and litigant resources from being misdirected by the claims of individuals who have been exposed to asbestos or silica but have *no functional or physical impairment* from asbestos-related or silica-related disease.

*Id.* § 1(n) (emphasis added). To achieve its purpose the Legislature adopted standards to differentiate between persons exposed to asbestos who were functionally impaired and those who had been exposed but were not functionally impaired, even though they may have been diagnosed with asbestosis. *Id.*; *see also* TEX. CIV. PRAC. & REM. CODE §§ 90.001(23), 90.003, 90.010(f)(1).[10]

In contrast to the situation in *Robinson*, this record contains no evidence that the legislative purpose underlying Chapter 90 was to benefit any particular entity. Chapter 90 contains a comprehensive set of requirements, definitions, and procedural steps for addressing the widespread problem the Legislature identified. The application of, and public purpose served by, the statute accords with cases we cited favorably in *Robinson*. *See Robinson*, 335 S.W.3d at 143-44; *see also In re A.V.*, 113 S.W.3d 355 (Tex. 2003) (declining to declare a statute unconstitutionally retroactive when the Legislature sought to protect children); *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618 (Tex. 1996) (finding retroactive legislation to safeguard the water supply compelling and not unconstitutionally retroactive). In this regard, the Emmites' claim that only Union Carbide has been benefitted by application of Chapter 90 is undermined by the

---

[10] We previously considered Chapter 90's purpose in the silica context. *See In re GlobalSantaFe Corp.*, 275 S.W.3d 477, 482 (Tex. 2008). There we noted that establishing a minimal level of impairment through a physician report before a lawsuit could proceed served the purpose of conserving judicial and litigant resources. *Id.* at 483.

legislative findings and the fact that the Emmites sued thirty-seven other companies along with Union Carbide.

We conclude that Chapter 90 serves a compelling public interest.

2. **Nature of the Right Impaired by the Statute and Extent of the Impairment**

We next consider the other two *Robinson* factors: the nature of the right impaired by Chapter 90 and the extent of that impairment. In *Robinson*, we held that at the time the Legislature enacted the statute being considered there, the Robinsons' right to pursue their common law personal injury claim had matured, recovery was predictable, and discovery had demonstrated their claims to have a substantial basis in fact. *Robinson*, 335 S.W.3d at 148. As to the extent of the impairment of that right, the choice of law statute effectively extinguished the Robinsons' common law action for personal injury. *Id.* It followed that the statute significantly disrupted the Robinsons' settled expectation that their right to proceed with their claim would not be legislatively abrogated after they filed suit. *Id.* at 148-49.

The present situation is markedly different. Until September 1, 2005, a claim for an asbestos-related injury by or on behalf of Joseph, or by his beneficiaries, would not have been subject to the pulmonary function testing requirement in Chapter 90. When the Emmites filed suit in June 2007, they could not satisfy the requirement of pulmonary function testing showing that Joseph had impairment, so undoubtedly their right to pursue a statutory wrongful death claim was detrimentally affected by Chapter 90. However, in light of the compelling public interest we have identified, and as we explain below, Chapter 90 did not impair the Emmites' right to recovery in such a manner as to be unconstitutionally retroactive.

30

As noted above, the situation before us is different from the one we addressed in *Robinson*. First, the timing of events is different. In *Robinson* the statute was enacted after the Robinsons filed their lawsuit. *Id.* at 155. In this case, Chapter 90 had been signed into law before Joseph died, it allowed a grace period for suits to be filed under the law as it previously existed, and it had been the law for more than a year before the Emmites filed suit. Also unlike *Robinson*, the Emmites' recovery was not yet predictable when Chapter 90 became effective. *See id.* at 148. In *Robinson*, John Robinson had been diagnosed with mesothelioma and the facts developed in discovery as of the time the Legislature enacted the statute demonstrated that the Robinsons' claims had a substantial basis in fact. *Id.* However, there is nothing in this record showing the Emmites were contemplating a suit based on claims of asbestos-related injury before Chapter 90 had taken effect. Unlike the situation in *Robinson*, no suit was pending based on Joseph's asbestos exposure when Chapter 90 became effective; his original death certificate did not mention asbestos-related disease; and the Emmites do not assert that Joseph's medical or other evidence demonstrated asbestos-related pulmonary impairment before May 2005, during his final hospitalization. It was over two years after his death and during the pendency of the Emmites' suit when they advised the trial court that they were seeking to have his death certificate amended to reference asbestosis as a cause of death. We fail to see how the Emmites reasonably could have had settled expectations that the Legislature would not change the requirements for a wrongful death lawsuit based on asbestos-related injury when they have not demonstrated that they were contemplating such a suit before Chapter 90 became effective, despite Joseph's history of asbestos exposure and the report to hospital personnel in May 2005, that he had previously been diagnosed with asbestosis. *See id.* at 148 ("The Robinsons could

31

well have expected . . . that a rule of law that permitted their recovery . . . would not be changed after they had filed suit to abrogate their claim."); *see also City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex. 1997) (finding that a statute was not unconstitutionally retroactive when the plaintiff had two months to sue before it became effective).

The Emmites recognize that it has long been the law in Texas that the Legislature may repeal a statute and immediately eliminate any right or remedy that the statute previously granted. *See Quick v. City of Austin*, 7 S.W.3d 109, 128 (Tex. 1998); *Dickson v. Navarro Cnty. Levee Improvement Dist. No. 3*, 139 S.W.2d 257 (Tex. 1940). They argue that their case is different. They submit that Chapter 90 did not repeal the Wrongful Death Act, but rather changed it to increase procedural requirements for only one particular type of recovery: that related to injuries from asbestos. They also argue that they had settled expectations as to the continuing viability of their statutory wrongful death claim because Texas has recognized such claims for a long time and their claim had accrued before Chapter 90 became effective. *See* TEX. CIV. PRAC. & REM. CODE § 16.003(b) (limitations begins to run on an injury resulting in death when the death occurs). We disagree with the Emmites' position.

First, as we have discussed above, the Emmites do not assert that they were contemplating a wrongful death suit before Chapter 90 became effective, nor have they demonstrated that before they filed suit they otherwise had expectations that the law as it existed prior to the enactment of Chapter 90 would govern their claim. Further, Chapter 90 did not purport to eliminate all wrongful death causes of action based on asbestos-related injuries. Rather, it was narrowly designed to address the documented crisis. *See* Act of May 16, 2005, 79th Leg., R.S., ch. 97, § 1, 2005 Tex.

32

Gen. Laws 169. Its adoption of functional pulmonary *impairment* as a threshold requirement for maintaining a cause of action was not an arbitrary legislative invention or standard, but a medically accepted standard for measuring asbestos-related effects. TEX. CIV. PRAC. & REM. CODE §§ 90.003(a)(2)(D), 90.010(f)(1)(B)(ii), 90.001(23); *see also* Act of May 16, 2005, 79th Leg., R.S., ch. 97, § 1 (n), 2005 Tex. Gen. Laws 169, 170.

The addition of procedural steps for bringing a statutory cause of action is not the kind of focused, special interest legislative action we held unconstitutional in *Robinson*. The Emmites could not have had reasonable expectations that the rules as to asbestos-related injury claims as they existed before September 1, 2005, would continue to apply beyond September 1, 2005, when Chapter 90 forewarned them that they would not, and when there is nothing in the record to demonstrate that they were contemplating a suit before Chapter 90 became effective, much less before it was enacted. In the context of a constitutional retroactivity challenge to the changed rules, the impact of Chapter 90 on the Emmites' expectations does not outweigh the compelling public interest it serves.

In sum, Chapter 90 did not upset settled expectations of the Emmites in the constitutional sense to the extent that it outweighs the compelling public interest found and addressed by the Legislature—even though, under these facts, Chapter 90 effectively bars their claim. Accordingly, Chapter 90 and section 90.010(f)(1)(B)(ii)'s pulmonary function testing requirement, as applied to the Emmites, does not violate the Texas Constitution's prohibition against retroactive laws.

## VI. Conclusion

We reverse the judgment of the court of appeals and render judgment dismissing the Emmites' suit.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** July 3, 2014