# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00812-CV

**Appellants, Ahmad Zaatari, Marwa Zaatari, Jennifer Gibson Hebert, Joseph "Mike" Hebert, Lindsay Redwine, Ras Redwine VI, and Tim Klitch // Cross-Appellants, City of Austin, Texas; Steve Adler, Mayor of the City of Austin; and the State of Texas**

**v.**

**Appellees, City of Austin, Texas, and Steve Adler, Mayor of the City of Austin // Cross-Appellees, Ahmad Zaatari, Marwa Zaatari, Jennifer Gibson Hebert, Joseph "Mike" Hebert, Lindsay Redwine, Ras Redwine VI, and Tim Klitch**

---

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-16-002620, THE HONORABLE TIM SULAK, JUDGE PRESIDING

---

## D I S S E N T I N G   O P I N I O N

The majority opinion expands fundamental-rights jurisprudence to strike down policy decisions properly left to Austin's City Council under their zoning power. Its approach leads to a misapplication of Retroactivity Clause precedent, creating tension with opinions of our sister courts of appeals; disregards Texas and U.S. history; and is an atextual expansion of the Assembly Clause. I respectfully dissent.

## I.     The Retroactivity Clause

The Texas Constitution provides that "[n]o bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." Tex. Const. art. I, § 16. The Property Owners' retroactivity challenge to Section 25-2-950—the ban on non-homestead short-term rentals that would go into effect in April 2022—is a facial

constitutional challenge instead of an as-applied one. They "cannot . . . assert that the [ordinance] is unconstitutional 'as applied' because [it] has never been applied to anyone." *See Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 626 (Tex. 1996). Therefore, they "must establish that the [ordinance], by its terms, always operates unconstitutionally." *Id.* at 627. And we must interpret the ordinance "to avoid constitutional infirmities" under the Retroactivity Clause. *See id.* at 629; *see also Union Carbide Corp. v. Synatzke*, 386 S.W.3d 278, 313, 317 (Tex. App.—Houston [1st Dist.] 2012) (en banc) (Bland, J., dissenting from retroactivity reasoning) ("A court must not hold a legislative enactment to be unconstitutional unless it is absolutely necessary to so hold. . . . If a statutory reading . . . springs constitutional doubt, and another reasonable interpretation exists, then it is not the interpretation that the legislature intended."), *rev'd*, 438 S.W.3d 39 (Tex. 2014).

"'Mere retroactivity is not sufficient to invalidate a statute. . . . Most statutes operate to change existing conditions, and it is not every retroactive law that is unconstitutional.' . . . [N]ot all retroactive legislation is bad." *Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 139 (Tex. 2010) (quoting *Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648 (Tex. 1971)).

In its entire history, the Supreme Court of Texas has held a law unconstitutionally retroactive only four times. *See Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 708 (Tex. 2014). Those four instances involved amendments to statutes of limitations and a new choice-of-law rule that extinguished a mature tort claim. *Id.* at 708 & n.34 (citing *Robinson*, 335 S.W.3d at 148–49; *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex. 1999); *Wilson v. Work*, 62 S.W.2d 490, 490–91 (Tex. 1933) (per curiam) (orig. proceeding); *Mellinger v. City of Hous.*, 3 S.W. 249, 254–55 (Tex. 1887)).

2

Since 2014, the Court has addressed only two retroactivity challenges and has upheld the challenged law both times. In one instance, the Court concluded that "a charter school's charter is not a vested property right to which the . . . prohibition on retrospective laws appl[ies]." *See Honors Acad., Inc. v. Texas Educ. Agency*, 555 S.W.3d 54, 68 (Tex. 2018). In the other, the Court concluded that "a statute authorizing property owners to petition [the Supreme Court] directly to determine which county is owed the [ad valorem] taxes" imposed on the owners by multiple counties was "not constitutionally retroactive." *See In re Occidental Chem. Corp.*, 561 S.W.3d 146, 150, 162 (Tex. 2018) (orig. proceeding).

Never has the Court struck down a zoning or property-use law as unconstitutionally retroactive, though Texas municipalities have been zoning and regulating property for decades.

## A. *Section 25-2-950 (type-2 rentals) is not retroactive.*

A statute is not retroactive merely because it is applied in a case arising from conduct that existed before the statute's enactment or if it "upsets expectations based in prior law." *Mbogo v. City of Dall.*, No. 05-17-00879-CV, 2018 WL 3198398, at *4 (Tex. App.— Dallas June 29, 2018, pet. denied) (mem. op.) (applying and quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994)). This is true particularly in the area of zoning regulations, for, there, "strong policy arguments and a demonstrable public need" support municipalities' "fair and reasonable termination of nonconforming property uses." *Mbogo*, 2018 WL 3198398, at *4 (quoting *City of Univ. Park v. Benners*, 485 S.W.2d 773, 778 (Tex. 1972)).

The majority opinion asserts that Section 25-2-950 "does not advance a zoning interest because both short-term rentals and owner-occupied homes are residential in nature." *See*

3

*ante* at 20.  However, ordinances differentiating one type of residential property from another are just as much exercises of the zoning power as are ordinances differentiating between residential property and commercial property.  *See, e.g.*, *Barr v. City of Sinton*, 295 S.W.3d 287, 289–91, 296–308 (Tex. 2009) (addressing ordinance that differentiated solely within "residential area" category and nevertheless treating it as zoning-related); *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 674–81 (Tex. 2004) (treating ordinance that restricted number of residences that could be built on undeveloped property as zoning ordinance even though it applied only to residential property).

Section 25-2-950 is a zoning ordinance.  It is found in the Code of Ordinances chapter titled "Zoning."  *See* Austin, Tex., Code of Ordinances ch. 25-2.  The majority opinion's conclusion that Section 25-2-950 is retroactive therefore creates tension with the Fifth Court of Appeals' opinion in *Mbogo*.  In that case, when the City of Dallas rezoned a portion of Ross Avenue to prohibit automobile-related businesses from operating there, the rezoning was not "retroactive" even though an affected business owner, who would have to discontinue his chosen business, had been operating his automobile-related business in the area since before the rezoning.  *Mbogo*, 2018 WL 3198398, at *1, *4.  "The ordinance did not change any use in the property thereby attaching a new legal consequence or upset any expectations based in prior law. Rather, it *prospectively* altered a property owner's future use of the property by setting a date by which to come into compliance."  *Id.* at *4 (emphasis added).

So too here.  But the majority opinion holds otherwise, leaping from the fundamental right of property ownership to what it deems within the "fundamental privilege[s] of property ownership"—"leas[ing] one's property on a short-term basis."  *See ante* at 22.  Surely the *Mbogo* business owner's use of his own property is no less important than a tenant's use of a

4

short-term-rental owner's property. But, by expanding the scope of fundamental property rights to include a tenant's use of a non-homestead property for a lease term of less than 30 days, the majority opinion wields fundamental-rights jurisprudence in a way that cannot comport with what the Fifth Court of Appeals held in *Mbogo*. And it finds no support in Texas Supreme Court jurisprudence or that of this Court's 127 year history.

### B. Even if retroactive, Section 25-2-950 (type-2 rentals) is not unconstitutionally retroactive, under Robinson.

Even if Section 25-2-950 is retroactive, it is not unconstitutionally so. Retroactive laws may still be constitutional under the *Robinson* three-factor test. *See* 335 S.W.3d at 145–50. Under that test, a retroactive law is unconstitutionally retroactive only so long as three factors weigh against the challenged law: (1) "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings," (2) "the nature of the prior right impaired by the statute," and (3) "the extent of the impairment." *Id.* at 145.

#### 1. Section 25-2-950 serves a strong public interest.

Zoning is a sufficiently strong public interest under the Retroactivity Clause: "strong policy arguments and a demonstrable public need" support "the fair and reasonable termination of nonconforming property uses," and "[m]unicipal zoning ordinances requiring the termination of nonconforming uses under reasonable conditions are within the scope of the police power." *Benners*, 485 S.W.2d at 778, *cited in Mbogo*, 2018 WL 3198398, at *6; *accord Caruthers v. Board of Adjustment of the City of Bunker Hill Vill.*, 290 S.W.2d 340, 350 (Tex. App.—Galveston 1956, no writ). "[T]he supreme court has not overruled *Benners*, and . . . we are bound to follow supreme court precedent." *Mbogo*, 2018 WL 3198398, at *6.

5

More broadly, efforts to "safeguard the public safety and welfare" are sufficiently strong public interests under the Retroactivity Clause. *See Barshop*, 925 S.W.2d at 634; *Texas State Teachers Ass'n v. State*, 711 S.W.2d 421, 424 (Tex. App.—Austin 1986, writ ref'd n.r.e.). In addition to zoning, public-welfare interests as varied as property-tax relief and testing teacher competence are sufficiently strong public interests under the Clause. *See White Deer Indep. Sch. Dist. v. Martin*, No. 07-18-00193-CV, 2019 WL 5850378, at *7 (Tex. App.—Amarillo Nov. 5, 2019, no pet. h.) (op., designated for publication); *Texas State Teachers Ass'n*, 711 S.W.2d at 422, 424–25.

The City of Austin's stated interests in enacting Section 25-2-950 are within the wide zone of strong public interests. The City says that short-term rentals are particularly susceptible to over-occupancy, which affects "fire safety" and "overwhelm[s] existing wastewater systems," and to tenants' "dump[ing] trash in the neighborhood"; "engag[ing] in public urination" and public intoxication; and "open drug use." The City also heard complaints about illegal parking, "noise, loud music, vulgarity, and other negative impacts of having a 'party house'" environment at short-term rentals.

The majority opinion faults the City for issuing notices of violation "to licensed short-term rentals only ten times." *Ante* at 20. Why is ten not enough? The majority opinion questions whether the ordinance is necessary to respond to ten notices of violation, "[b]ut the necessity and appropriateness of legislation are generally not matters the judiciary is able to assess." *Robinson*, 335 S.W.3d at 146. We need not determine whether the law is "the only, the best, or even a good way" to achieve the stated public interest. *See id.* If the public interest is sufficiently strong, we need go no further—the "nature and strength of the public interest" is enough under *Robinson*. *See id.* at 145. Section 25-2-950 rests on strong, public-welfare interests.

6

## 2. *The right that Section 25-2-950 impairs is narrow.*

The strength of a municipality's zoning interest is mirrored by the weakness of property owners' rights in zoning-burdened property: "an individual has no protected property interest in the continued use of his property for a particular purpose just because such use has commenced or a zoning classification has been made." *Mbogo*, 2018 WL 3198398, at *5 (citing *Benners*, 485 S.W.2d at 778); *accord City of La Marque v. Braskey*, 216 S.W.3d 861, 863 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (also citing *Benners*). The majority opinion's distinction between using property and leasing it is, for these purposes, of no material difference. An owner's lease of his or her property is a use of the property, and the tenant is leasing the property so he or she can use it. In fact, the Assembly Clause portion of the majority opinion bears this out when it considers the tenant-affecting ordinance to be "[t]he regulation of property use." *See ante* at 41 ("The regulation of property use is not, in and of itself, a compelling interest.").

But even if the two uses are distinct, it is possible to interpret Section 25-2-950 as constitutional under this factor. Under Section 25-2-950 property owners may still lease their property. They must simply lease it for 30 days or more or make it their homestead. Therefore, the right that Section 25-2-950 impairs is narrow.

## 3. *Section 25-2-950 only lightly impairs the short-term-rental right because of the grace period until 2022.*

"[I]mpairment of . . . a right may be lessened when a statute affords a plaintiff a grace period," *Tenet Hospitals*, 445 S.W.3d at 708, "or a reasonable time to protect his investment," *Mbogo*, 2018 WL 3198398, at *7. The Fifth Court of Appeals resolved this third factor against unconstitutionality because, though the business owner "did not believe that he

7

could get a fair price" in selling his business, "despite *never* listing his property on the market," that did not equate to an "abus[e of] legislative power" by the city. *Id.* (emphasis in original).

In contrast here, the majority opinion relies simply on "a loss of income for the property owners." *See ante* at 23. Though no doubt important, loss of income is not enough under *Robinson*. Loss of investment is the touchstone. *See Mbogo*, 2018 WL 3198398, at *7; *Village of Tiki Island v. Ronquille*, 463 S.W.3d 562, 587 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (lack of "avenue for recoupment" of "existing investment" was relevant). There is no showing that the Property Owners cannot recoup their investments in their rental properties before April 2022. Also, even shorter grace periods than three years have been sufficient elsewhere. *See Tenet Hosps.*, 445 S.W.3d at 708. Time allowed to mitigate investment loss makes any impairment "slight." *See White Deer Indep. Sch. Dist.*, 2019 WL 5850378, at *8. Just because the property owners are not making as much profit as they could with unfettered rights to short-term rentals does not mean their property right has been unconstitutionally impaired.

In sum, under *Robinson*, Section 25-2-950 is not a retroactive law, and, even if it were, it is constitutional under the three-factor test.

## II.     The Assembly Clause

I also disagree with the majority opinion's holding that Section 25-2-795—the ordinance establishing certain occupancy limits for short-term rentals—must withstand heightened due-process scrutiny, instead of simply rational-basis review. It purports to reach this holding based on the Assembly Clause in the Texas Bill of Rights, which says: "The citizens shall have the right, in a peaceable manner, to assemble together for their common good; and

8

apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance." Tex. Const. art. I, § 27.

### A.    *The text-informing history of the Assembly Clause*

The majority opinion formulates the rights granted by the Assembly Clause by importing dictionary definitions of "assemble," "common," and "good." It uses those definitions to conclude that the Assembly Clause protects citizens' "right to physically congregate, in a peaceable manner, for their shared welfare or benefit." *Ante* at 33.

"When identifying fundamental rights, . . . an exacting *historical and textual analysis*" is required. *In re J.W.T.*, 872 S.W.2d 189, 211 (Tex. 1994) (Cornyn, J., dissenting from denial of reh'g) (emphasis added). And when we seek to understand constitutional history, "it is important to get that history right before engaging in the complex and separate task of judging how such insights might or might not be applied to contemporary legal problems." Saul Cornell, *"To Assemble Together for Their Common Good": History, Ethnography, and the Original Meanings of the Rights of Assembly and Speech*, 84 Fordham L. Rev. 915, 934 (2015).

Historically, Texas is not the only state whose constitution has a bill of rights like that of the U.S. Constitution. And Texas's Assembly Clause is not the only one to limit its state constitutional right of assembly to the purpose of furthering the "common good." Such language was common in many of the early state constitutions. Similar language can be found in the constitutions of Pennsylvania (1776), Vermont (1777), North Carolina (1776), Massachusetts (1780), and New Hampshire (1783). *See id.* at 931–32. Although individuals are the holders of the right to assemble, its exercise is framed as a civic enterprise. *Id.* at 932. Hence, there is a

9

historical difference between the right to gather to "inflame passions" and the right to gather to "promote reasoned discourse." *See id.*

It is also important to note that a limitation of the right to assemble to matters involving "the common good" was initially included in the U.S. Constitution's Bill of Rights. *See* John D. Inazu, *The Forgotten Freedom of Assembly*, 84 Tulane L. Rev. 565, 571–72 (2010). During House debates, there was much discussion over whether the right to assemble should be limited to matters involving "the common good." As one representative told another, if he "supposed that the people had a right to consult for the common good" but "could not consult unless they met for the purpose," he was in fact "contend[ing] for nothing." *Id.* at 572 (quoting 1 *Annals of Cong*. 760–61 (Joseph Gales ed., 1834)). In other words, though there was concern that the state would interpret the "common good" limitation to oppress minority or dissenting political viewpoints, none disputed that the right of assembly was focused on promoting open, civic discourse and deliberations on matters of public welfare. *See* Cornell, *"To Assemble Together for Their Common Good": History, Ethnography, and the Original Meanings of the Rights of Assembly and Speech*, *supra* at 932 & n.154. While the language limiting the right to assemble was initially retained by both the House and the Senate, it ultimately was removed before passage. Inazu, *The Forgotten Freedom of Assembly*, *supra* at 573 (citing S. Journal, 1st Cong., 77 (Sept. 9, 1789)).

The Texas Constitution was established in 1876 with this wealth of history to draw upon. It did not recognize an unfettered right to assemble for whatever purpose and in whatever manner at whatever time of day, as the majority opinion suggests. It instead limited that right to assemble in two important ways: it must be peaceable, and it must be for the citizens' common good. The majority opinion distinguishes "*their* common good" from "*the*

10

common good" but ignores that the assembly right is granted to "citizens" rather than to "people" more broadly. *Compare* Tex. Const. art. I, § 27 (assembly right for "citizens"), *with id.* §§ 9 (protecting "people" from unreasonable searches and seizures), 34 (granting "[t]he people" certain rights to hunt, fish, and harvest wildlife). The drafters' specific use of "citizens" implies a link to public discourse that using "people" does not.[1]

Historically and textually, the Assembly Clause assures Texans the fundamental right to peaceably gather for purposes of meaningful civic discourse without fear of retribution. The Clause goes hand in hand with freedom of speech; it ensures that those who speak may have an audience. This is why, as the majority opinion recognizes, the Supreme Court of the United States regularly addresses speech and assembly jointly. *See* Inazu, *The Forgotten Freedom of Assembly*, *supra* at 597.

The City of Austin has passed limitations on certain short-term rentals that on their face have nothing to do with assembling for the common good to participate in civic discourse. The City believes it has evidence to support that short-term rentals give rise to non-peaceable assemblies disconnected from citizens' common good. The City's restrictions, then, are assembly-neutral zoning regulations that have a rational basis. To reach a contrary

---

[1] The majority opinion's response on this point—that only "citizens" are granted the Texas Assembly Clause's rights—introduces another problem. *See ante* at 35 n.7. The majority opinion's position *must* be that the "citizens" protected by the Texas Constitution are unlimited—citizens of Texas; of Oklahoma; of Virginia, like Messrs. Jefferson and Henry in the majority opinion's hypothetical, *see ante* at 39; etc. For if only Texans are clothed with the Texas Constitution's assembly rights, then Section 25-2-795 is not unconstitutional in every respect as is required to sustain a facial constitutional challenge. The City of Austin could still constitutionally apply the ordinance to short-term rentals made to non-holders of Texas assembly rights—non-Texans. In this way, the majority opinion's holding reaches beyond what its reasoning supports: either it invalidates Section 25-2-795 even for people who have not been shown to be holders of Texas assembly rights, or it atextually conflates the constitution's use of the distinct terms "citizens" and "people," despite the drafters' considered choice to use the two different terms.

11

conclusion could lead to a challenge to every statute or ordinance regulating conduct that involves people "assembling" together, including trespass and anti-camping statutes. Instead, such enactments should be susceptible to assembly challenge only as enactments targeting non-"common good," non-peaceable assemblies.

The majority opinion also does not give due weight to the phrase "in a peaceable manner" in its analysis. As the Court of Criminal Appeals recognized, the Assembly Clause "specifically limits its protection to 'peaceable assembly.'" *Ferguson v. State*, 610 S.W.2d 468, 470 (Tex. Crim. App. 1979).[2] This matters because the City relies on evidence of (i) short-term rentals' harms to "public health, public safety, the general welfare, and preservation of historic neighborhoods" and (ii) "concerns . . . about short-term rental properties that were poorly maintained, that had code violations, and that generated police and fire reports." The City says that it uncovered evidence of over-occupancy in short-term rentals, which affects "fire safety" and "overwhelm[s] existing wastewater systems." It heard complaints about short-term tenants' "dump[ing] trash in the neighborhood"; "engag[ing] in public urination"; public intoxication; and "open drug use, including at one rental next door to a home with a five-year old child." It heard complaints about illegal parking, "noise, loud music, vulgarity, and other negative impacts of having a 'party house'" environment. And even when City code personnel have cited short-term tenants for misconduct, the misconduct often continues because "[s]ome short-term

---

[2] Inazu, whom the majority opinion relies on, recognizes the peaceableness limitation. He describes the First Amendment "text handed down to us" as "convey[ing] a broad notion of assembly in two ways. First, it does not limit the purposes of assembly to the common good, thereby implicitly allowing assembly for purposes that might be antithetical to that good (although constraining assembly to peaceable means)." *See* John D. Inazu, *The Forgotten Freedom of Assembly*, 84 Tulane L. Rev. 565, 576 (2010).

rental operators completely ignore the concerns of neighbors, and do not regulate tenant misconduct."

All this and more may bear on an inquiry into peaceable assembly for citizens' common good. But the majority opinion never undertakes such an inquiry, despite the plain constitutional text. Instead, it sets up the strawman that the City's concerns are limited to "reduc[ing] the likelihood that short-term rentals would serve as raucous 'party houses' . . .and . . . reduc[ing] possible strain on neighborhood infrastructure," overlooking the City's other public-health and public-safety concerns. *See ante* at 40. In doing so, it considers Section 25-2-795 to be mere "regulation of property use." *See ante* at 41.

Analyzing peaceableness requires a broader view. The concept's role in Texas jurisprudence suggests why. The Court of Criminal Appeals once struck down as unconstitutional a statute proscribing "any collection of more than two picketers either within fifty feet of any entrance to picketed premises or within fifty feet of each other" in part because the statute failed to consider "the peacefulness of the group, the lack of obstruction to the flow of traffic, or the level of noise, if any, generated by the picketers." *Olvera v. State*, 806 S.W.2d 546, 552 (Tex. Crim. App. 1991); *cf. De Jonge v. Oregon*, 299 U.S. 353, 365 (1937) ("[C]onsistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime."). Relatedly, driving while intoxicated is "a breach of the peace," for purposes of a warrantless arrest. *See Banda v. State*, 317 S.W.3d 903, 912 n.4 (Tex. App.—Houston [14th Dist.] 2010, no pet.). And so is "curs[ing] and creat[ing] a disturbance" when a peace officer is investigating a complaint. *See Johnson v. State*, 481 S.W.2d 864, 865–66 (Tex. Crim. App. 1972).

Loud noise. Obstructing infrastructure. Flouting law enforcement. Public disturbances. Threats to public safety. All these may make an assembly non-peaceable and have

nothing to do with civic discourse. And the City believes that it has evidence of short-term rentals causing all these. To determine whether the City is right, we should examine what ties all these examples together as breaches of the peace disconnected from the common good. The majority opinion eschews a full peaceableness or "common good" analysis, however, sidestepping what the plain constitutional text requires.

### B. *Texas courts conceive of fundamental rights much more narrowly.*

The majority opinion is also out of step with Texas "fundamental right" precedent. When litigants plead constitutional violations of allegedly fundamental rights, Texas courts are typically more circumspect than the majority opinion is in defining the scope of the right at issue. By not giving due weight to the concepts of peaceableness and citizens' common good in its holding that "the right to assemble granted by the Texas Constitution is a fundamental right," thereby requiring strict scrutiny, the majority opinion sweeps too broadly. *See ante* at 35.

It has no limiting principle. The effect of the majority opinion's view is that any regulation affecting any activity, anywhere in Texas, is subject to strict-scrutiny review so long as more than one person is involved. This view will have exactly the kind of far-reaching effects that the Retroactivity Clause would have had if the Supreme Court had not prevented it from being interpreted overly literally. *Cf. Robinson*, 335 S.W.3d at 138–39 (quoting *Texas Water Rights Comm'n*, 464 S.W.2d at 648).

Consider how the majority opinion's sweeping approach might undermine other common-sense results. When a student's parent challenged a statute prohibiting students from participating in extracurricular activities, no matter where they take place, unless the student maintained a 70% grade average, the Supreme Court of Texas considered the right at issue to

14

be "the right to participate in extracurricular activities." *See Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 557–60 (Tex. 1985). But what if the Court, like the majority opinion here, couched the right more generally as the right "to get together or congregate"? That would encompass extracurricular activities on campus or elsewhere. The Supreme Court then would have analyzed the parent's challenge under heightened scrutiny. Instead, it disposed of the challenge on rational-basis review. *See id.*

Elsewhere, this Court upheld a Travis County park rule restricting access to a park known for nude sunbathing to people over 18 years old. *See Central Tex. Nudists v. County of Travis*, No. 03-00-00024-CV, 2000 WL 1784344, at *1, *4, *8 (Tex. App.—Austin Dec. 7, 2000, pet. denied) (not designated for publication). Nudist parents who wanted to bring their children to the park challenged the rule, but this Court held that the rule did not infringe on any fundamental right and did not "affect the ability of the [parents] or other naturist parents to associate with their children, but regulate[d] only where such associations may occur." *See id.* at *3–4, *6. The parents could not congregate with their children anywhere they pleased. But, here, the majority opinion seems to say that assembly rights are fundamental no matter where they are exercised.[3]

---

[3] The majority opinion relegates to a footnote the "privacy rights [that] are implicated in [its] right-of-assembly analysis." *See ante* at 37 n.9. The majority opinion does not divine a difference between federal and state privacy rights and relies on opinions from the Supreme Court of the United States. *See id.* But the footnote fails to consider the similar ordinance upheld in *Village of Belle Terre v. Boraas*, 416 U.S. 1 (1974). There, the ordinance

> restricted land use to one-family dwellings excluding lodging houses, boarding houses, fraternity houses, or multiple-dwelling houses. The word "family" as used in the ordinance means, "(o)ne or more persons related by blood, adoption, or marriage, living and cooking together as a single housekeeping unit, exclusive of household servants. A number of persons but not exceeding two (2) living and

15

The majority opinion is inconsistent with "fundamental right" precedent because it couches the right at issue far more broadly than Texas courts traditionally would.

### C.     Neither of Texas's high courts have taken the novel step that the majority opinion takes today.

Finally, the majority opinion oversteps our Court's role as an intermediate court by declaring a fundamental right to congregate without fully analyzing peaceableness or the advocacy of a matter of public welfare.  We should instead leave this function to our state's two high courts.

Declaring rights fundamental, and thus beyond ordinary democratic give-and-take, is a weighty matter.  *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2604–06 (2015) (holding that federal Due Process and Equal Protection Clauses forbid denying fundamental right to marry to same-sex couples and noting that that holding places right "beyond the reach of majorities and officials").  Declaring fundamental the right to congregate, without any real qualification, is a novel and big step into this weighty area because "[e]conomic regulations, including zoning decisions, have traditionally been afforded only rational relation scrutiny." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 939 (Tex. 1998).[4]

---

cooking together as a single housekeeping unit though not related by blood, adoption, or marriage shall be deemed to constitute a family."

*Id.* at 2.  The Court upheld the ordinance, holding that the suit "involve[d] no 'fundamental' right guaranteed by the Constitution, such as . . . the right of association . . . or any rights of privacy." *Id.* at 7 (internal citations omitted).  The majority opinion's footnote does not attempt to distinguish *Village of Belle Terre*.

[4]  The majority opinion considers Section 25-2-795 to be a zoning ordinance because, in holding Section 25-2-795 unconstitutional, it relies on authority instructing that "[w]e must 'not assume that zoning codes inherently serve a compelling interest, or that every incremental gain to city revenue (in commercial zones), or incremental reduction of traffic (in residential zones),

The majority opinion recognizes that neither the Supreme Court of Texas nor the Court of Criminal Appeals of Texas has declared an unbounded right to congregate to be fundamental. As noted above, the Court of Criminal Appeals considers the Assembly Clause to be "specifically limit[ed] . . . to 'peaceable assembly.'" *Ferguson*, 610 S.W.2d at 470. And history provides the important context that peaceable assemblies are only protected to the extent they implicate the common good, whether advocating majority or minority viewpoints.

Because the high courts have not yet taken this step, we should refrain from doing so. *Cf. Ex parte Morales*, 212 S.W.3d 483, 490–93 (Tex. App.—Austin 2006, pet. ref'd) (refusing to declare "adult consensual sexual activity" to be fundamental right); *In re Living Ctrs. of Am., Inc.*, 10 S.W.3d 1, 6 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding [mand. denied]) (refusing to declare "the fair administration of justice" to be fundamental right). We should refrain even more because the two interpretations of assembly rights advanced by the majority opinion—that "the purposes of assembly" are not limited "to the common good" or to "petitioning the government"—have not "been readily acknowledged in legal and political discourse." *See* Inazu, *The Forgotten Freedom of Assembly*, *supra* at 576–77. Indeed, the majority opinion's view is called into question by hundreds of years of historical and legal precedent.

For these reasons, I dissent from the majority opinion regarding due process. I would review Section 25-2-795 under the rational-basis test because it is a zoning law supported

is compelling." *See ante* at 41 (quoting *Barr v. City of Sinton*, 295 S.W.3d 287, 307 (Tex. 2009)). *Barr* involved the fundamental right of free exercise of religion, which is not at issue here. *See* 295 S.W.3d at 305–06. The majority opinion does not explain how Section 25-2-795 can be a zoning ordinance while Section 25-2-950 "does not advance a zoning interest." *Compare ante* at 20 (no zoning interest), *with ante* at 41 (zoning).

by the City of Austin's inherent police powers, is supported by a lengthy record, and does not impinge upon any citizen's right to peaceably assemble to advocate for the common good.

I would affirm the trial court's grant of the City's no-evidence motion for summary judgment.

_____

Chari L. Kelly, Justice

Before Chief Justice Rose, Justices Goodwin and Kelly

Filed: November 27, 2019