# Supreme Court of Texas

No. 22-0179

Texas Tech University Health Sciences Center–El Paso,

*Petitioner*,

v.

Dr. Lindsey Niehay,

*Respondent*

On Petition for Review from the
Court of Appeals for the Eighth District of Texas

JUSTICE BOYD, joined by Justice Lehrmann, dissenting.

> "The term 'disability' . . . shall be construed
> in favor of *broad coverage* of individuals . . .
> to the *maximum extent* allowed."[1]

This should be a simple statutory-interpretation case governed by well-established rules of statutory construction. The issue is whether Dr. Lindsey Niehay submitted some evidence that Texas Tech University Health Sciences Center dismissed her from its residency

[1] TEX. LAB. CODE § 21.0021(a)(1) (emphases added); *see also* 42 U.S.C. § 12102(4)(A) (same except using "permitted" instead of "allowed").

program "because of" a "disability," in violation of Chapter 21 of the Texas Labor Code. *See* TEX. LAB. CODE § 21.051(1).[2] The Court concludes she didn't, but only because it requires her to show that her physical impairment was "caused by an underlying physiological disorder or condition." *Ante* at 2. Nothing in Chapter 21, however, imposes that requirement or otherwise limits the term "disability" to physical or mental impairments that result from any particular cause.

Nor does anything in any analogous federal law. To the contrary, after the United States Supreme Court initially "narrowed the broad scope of protection intended to be afforded" under the Americans with Disabilities Act (ADA),[3] "thus eliminating protection for many individuals whom Congress intended to protect" and thereby leading lower courts to "incorrectly [find] in individual cases that people with a range of substantially limiting impairments are not people with disabilities," Congress amended the ADA to expressly "reject" the Court's "inappropriately high level of limitation necessary to obtain coverage under the ADA" and to "reinstate" a "broad view" of the ADA's

---

[2] The Legislature abolished the Texas Commission on Human Rights twenty years ago and transferred its authority and responsibilities to the Texas Workforce Commission. *See* TEX. LAB. CODE § 21.0015. In light of those changes, this Court explained the following year that "we will not refer to chapter 21 of the Labor Code as the Commission on Human Rights Act," since that Act no longer existed. *Little v. Tex. Dep't of Crim. Just.*, 148 S.W.3d 374, 377–78 (Tex. 2004). Although Texas courts, including this one, have continued to refer in some opinions to the Texas Commission on Human Rights Act (or TCHRA), I will refer simply to Chapter 21.

[3] *See, e.g., Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196–97 (2002) (narrowly construing the terms "substantially limits" and "major life activities"); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483–84 (1999) (holding that mitigating measures may negate a "disability").

applicability. ADA AMENDMENTS ACT OF 2008, Pub. L. No. 110–325, § 2, 122 Stat. 3553, 3553–54 (expressly citing and rejecting the Court's holdings in *Toyota* and *Sutton*).

Among other revisions, Congress amended the ADA to expressly require courts to construe the term disability "in favor of broad coverage of individuals . . ., to the maximum extent permitted by the [ADA's] terms." 42 U.S.C. § 12102(4)(A). In fact, Congress expressly conveyed its "intent" that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis"; instead, "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations." 122 Stat. 3554. Because one of Chapter 21's express purposes is to "provide for the execution of the policies embodied in" the ADA, TEX. LAB. CODE § 21.001(3), the Texas Legislature quickly followed Congress's lead, amending Chapter 21 to likewise require that the term disability be construed "in favor of broad coverage of individuals" and "to the maximum extent allowed," *id.* § 21.0021(a)(1).

But sometimes it's hard for judges to see the trees for the forest. Distracted by policy preferences and fears of seemingly unwise or "untenable" results, *ante* at 15, some (but certainly not all) courts have continued to disregard the clear statutory language in favor of judicially imposed requirements and limitations the courts assume must be what Congress or the legislature intended (regardless of what they actually said). But if we simply apply Chapter 21's plain language in this case in accordance with our well-established statutory-construction rules, Niehay undeniably submitted some evidence that she had a "disability"

3

and that the University dismissed her from its residency program "because of" that disability. To reach the opposite result, the Court "bypasse[s] the statutory text entirely." *VF Jeanswear LP v. Equal Emp. Opportunity Comm'n*, 140 S. Ct. 1202, 1204 (2020) (Thomas, J., dissenting from denial of cert.).

## I.
## Texas Labor Code

The Texas Labor Code expressly defines[4] the term "disability" to mean a "mental or physical *impairment*." TEX. LAB. CODE § 21.002(6) (emphasis added). More specifically, a disability is either (1) "a mental or physical *impairment* that substantially limits at least one major life activity," (2) "a record of such an *impairment*," or (3) "being regarded as having such an *impairment*." *Id.* (emphases added). In this Court, Niehay relies only on the third option. For this option, Niehay must establish that the University regarded her as having more than a "minor" impairment that it "expected to last . . . less than six months," but she need not show that the University regarded her as having an impairment that limited a "major life activity." *Id.* § 21.002(12-a).

---

[4] Because the statute defines the term "disability," we must apply this definition regardless of any other meaning the term may carry in other circumstances. *See Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 894 (Tex. 2018) ("[W]e must adhere to statutory definitions."); *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018) ("Courts must adhere to legislative definitions of terms when they are supplied." (citing TEX. GOV'T CODE § 311.011(b))); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("If a statute . . . assigns a particular meaning to a term, we are bound by the statutory usage."); *see also* TEX. GOV'T CODE § 311.011(b) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.").

The Code, however, does not define the term "impairment." When a statute uses an undefined term, our well-established statutory-construction rules require us to (1) apply the term's "common, ordinary meaning" unless (2) "a contrary meaning is apparent from the statute's language" or (3) application of the common, ordinary meaning would lead to "absurd or nonsensical results." *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 183 (Tex. 2019) (quoting *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011)); *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 34 (Tex. 2017) (citing *Univ. of Tex. at Arlington v. Williams*, 459 S.W.3d 48, 52 (Tex. 2015)). Under these rules, Niehay undeniably established that she suffers from a physical impairment and thus a disability under Chapter 21.

## A.      Common, ordinary meaning

To determine a word's common, ordinary meaning, we look first to the word's dictionary definitions and then to its "usage in other statutes, court decisions, and similar authorities." *Marriage & Fam. Therapists*, 511 S.W.3d at 34–35. Dictionaries define an "impairment" as simply a diminishment, deterioration, or loss of function or ability. *See Impairment*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002); *Impairment*, THE OXFORD ENGLISH DICTIONARY (2d ed. 1989); *see also Impairment*, STEDMAN'S MEDICAL DICTIONARY (5th ed. 1982) ("Weakening, damage, or deterioration . . . ."); *Impairment*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[A] condition in which a part of a

person's mind or body is damaged or does not work well . . . .").[5] Under this plain meaning, an impairment is simply a loss, reduction, or limitation in function or ability. To qualify as a "disability," the impairment must be "mental or physical" and must "substantially" limit a major life activity (or be regarded as more than a "minor" impairment), but nothing about the definition requires that the limitation be caused by an underlying physiological disorder or any other particular cause or source. *See Impairment*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (31st ed. 2007) ("[A]ny abnormality of, partial or complete loss of, or loss of the function of, a body part, organ, or system; this may be due directly or secondarily to pathology or injury . . . .").

Neither the parties nor the Court has pointed to any other statute using the term "impairment" in a way that suggests anything other than its common, ordinary meaning, much less that a loss or limitation in function qualifies as an "impairment" only if it results from a particular cause. To the contrary, when the legislature intends to limit a statutory reference to "impairments" to those resulting from a particular cause, it consistently and expressly includes that limitation within the statute.[6]

---

[5] I wholeheartedly agree with our concurring colleague's explanation that we must focus on the meaning of the term "impairment" as it was commonly understood when the legislature enacted the statute using that term. *See ante* at 2–3 (Blacklock, J., concurring). As these sources demonstrate, however, the common, ordinary meaning of "impairment" has not changed over time.

[6] *See, e.g.*, TEX. LAB. CODE § 401.011(23) (defining "impairment" for workers-compensation purposes as "any anatomic or functional abnormality or loss . . . *that results from a compensable injury*" (emphasis added)); TEX. HEALTH & SAFETY CODE §§ 87.001(1) (defining "birth defect" to mean "a physical or mental functional deficit or impairment . . . *resulting from one or*

6

Otherwise, Texas statutes consistently use the term "impairment" to refer to a particular loss or diminishment *regardless* of its cause.[7]

And this Court has consistently used the term "impairment" in the same way—including when referring to mental or physical impairments—to refer simply to a loss or diminishment in function,[8] unless the applicable statute expressly requires that the loss result from a particular cause.[9] Indeed, in this Court's prior decisions addressing "disabilities" and "impairments" under Chapter 21, we have never

---

*more genetic or environmental causes*" (emphasis added)), 242.061(a)(2) (defining "immediate threat to health and safety" as a situation in which injury, harm, impairment, or death may be caused by a facility's noncompliance with statutory requirements).

[7] Chapter 121 of the Human Resources Code, for example, which specifically addresses the state's policy "to encourage and enable persons with disabilities to participate fully in the social and economic life of the state," TEX. HUM. RES. CODE § 121.001, defines "person with a disability" to include any person who has a "hearing impairment," a "speech impairment," or a "visual impairment," *id.* § 121.002(4). Similarly, the Education Code defines "children with disabilities," in reference to those who are eligible to participate in a school district's special-education program, to include those with a "visual or auditory impairment." *See* TEX. EDUC. CODE §§ 29.003(b), 30.001(a). Neither statute requires that the impairment result from any particular cause.

[8] *See, e.g.*, *Ad Villarai, LLC v. Chan II Pak*, 519 S.W.3d 132, 138 & n.4 (Tex. 2017) (addressing whether a judge is "unable to hold court" in light of the terms "disability" and "impairment," without suggesting the terms require any particular cause); *Univ. of Tex. at El Paso v. Herrera*, 322 S.W.3d 192, 198 n.35 (Tex. 2010) (observing that the phrase "serious health condition," as used in federal law, includes any serious "illness, injury, impairment, or physical or mental condition," without suggesting the terms require a particular cause).

[9] *See, e.g.*, *Ins. Co. of State of Penn. v. Muro*, 347 S.W.3d 268, 275 (Tex. 2011) (noting that "impairment" under the Workers Compensation Act means "any anatomic or functional abnormality or loss . . . that results from a compensable injury" (quoting TEX. LAB. CODE § 401.011(23))).

7

suggested that the statute requires the claimant's mental or physical loss or limitation to result from any particular cause.[10]

## B.     Statutory context

Under our well-established statutory-construction rules, however, we may not apply an undefined term's common, ordinary meaning if "a contrary meaning is apparent from the statute's language." *Marriage & Fam. Therapists*, 511 S.W.3d at 34 (citing *Williams*, 459 S.W.3d at 52). For this reason, when construing an undefined statutory term, we must consider the term's usage within the statute as a whole, allowing the statutory context to inform the term's meaning. *See KMS Retail Rowlett*, 593 S.W.3d at 183; *TGS–NOPEC Geophysical*, 340 S.W.3d at 439. But nothing in Chapter 21 suggests it uses the term "impairment" to mean anything other than a loss, diminishment, or limitation in mental or physical function. To the contrary, Chapter 21's other provisions confirm that an "impairment" is simply a "condition" that "limits" the claimant's functions. *See* TEX. LAB. CODE §§ 21.002(6), .0021(a)(2). In fact, at least two provisions appear to use the term "limitation" interchangeably with the term "impairment." *See id.* § 21.128(a), (d) (requiring reasonable accommodations for "a known physical or mental limitation of an otherwise qualified individual with a disability").

But in evaluating the context of section 21.002(6)'s use of the term impairment to define the term disability, section 21.0021(b) provides the

---

[10] *See, e.g.*, *City of Houston v. Proler*, 437 S.W.3d 529, 532–33 (Tex. 2014); *Haggar Apparel Co. v. Leal*, 154 S.W.3d 98, 99–101 (Tex. 2004); *Little*, 148 S.W.3d at 381–84.

most crucial guidance. As emphasized above, that section expressly states that the term disability "shall be construed in favor of *broad coverage* of individuals under Subchapters B and C [of Chapter 21], to the *maximum extent* allowed under those subchapters." *Id.* § 21.0021(a)(1) (emphases added). In other words, directly contradicting the Court's analysis today, Chapter 21 expressly compels courts to construe the term broadly without imposing any unexpressed requirements.

## C. Results

Even when—as here—the statutory context confirms the common, ordinary meaning of an undefined term, we might not apply that meaning if doing so would lead to "absurd or nonsensical results." *KMS Retail Rowlett*, 593 S.W.3d at 183. Here, the Court avoids such strong terminology and instead refuses to apply the common, ordinary meaning of "impairment" because, in its view, the results of doing so would be "untenable." *Ante* at 15.[11] But this exception to the ordinary-meaning rule uses strong words for a reason: the "absurdity bar 'is high, and should be,' because 'mere oddity does not equal absurdity.'" *City of Fort Worth v. Rylie*, 602 S.W.3d 459, 467 (Tex.

---

[11] Today's concurring opinion makes a similar argument. But instead of relying on the "absurd" or "nonsensical" or "untenable" labels, it frets about the "substantial social and economic consequences" of characterizing "obesity" as a disability. *Ante* at 10 (Blacklock, J., concurring). The first answer to that concern, of course, is that Chapter 21 does not define disability based on size or weight, whether normal or abnormal. It defines it based on *impairment*—a "limitation" of the person's mental or physical "activities" and "functions." TEX. LAB. CODE §§ 21.002(6), (12-a), .0021(a)(2), (b), .105, .128(a), (d). The concurring opinion incorrectly assumes that everyone who is obese must have "substantially," or at least "more than minor," limited physical functions.

9

2020) (quoting *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013)). If the legislature makes a policy choice to define the term disability more broadly than we think is wise, we are not at liberty to veto that choice. Our job is to read and apply statutes "as they are written, not as they make the most policy sense" to us. *Combs*, 401 S.W.3d at 629.

In short, that the Court does not agree with the result the statute's plain language produces provides no basis for the Court to add language to the statute. We must "take statutes as we find them, presuming the Legislature included words that it intended to include and omitted words it intended to omit." *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 52 (Tex. 2014). And we may not "read words into a statute to make it what we consider to be more reasonable" or, I would add, more tenable; "rather we may do so only to prevent an absurd result." *Id.* (citing *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010)). The "foremost task of legal interpretation" is to divine "what the law *is*, not what the interpreter *wishes* it to be," *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 78 (Tex. 2017), so that ordinary citizens can rely on the statute's language to mean what it plainly says, *PHI, Inc. v. Tex. Juv. Just. Dep't*, 593 S.W.3d 296, 303 (Tex. 2019) (citing *Fitzgerald v. Advanced Spine Fixation Sys.*, 996 S.W.2d 864, 866 (Tex. 1999)).

In any event, the Court and our concurring colleague fail to consider whether the results that concern them are indeed the results of applying the common, ordinary meaning of "impairment." Even if the term broadly includes physical limitations related to morbid obesity, or

10

even just to obesity,[12] that would not mean that every obese or morbidly obese person could sue or recover from their employer for disability discrimination. This is because, initially, most claimants who sue for discrimination based on a disability must demonstrate that they suffer from an impairment that "*substantially limits* at least one major life activity," or that they have a record of having such an impairment. TEX. LAB. CODE § 21.002(6) (emphasis added). And those who claim that their employer "regarded" them as having a disability must show that the employer perceived them as having an impairment that is more than "minor." *Id.* § 21.002(12-a). Accordingly, claimants cannot rely simply on the fact that they are obese or morbidly obese; they must demonstrate that their obesity involves physical limitations that are *substantial* or that are perceived to be more than just *minor*. *See id.* § 21.002(6), (12-a).

But more importantly, Section 21.105 provides that Chapter 21's provisions that refer to "disability" discrimination apply "only to discrimination because of or on the basis of a physical or mental condition that does not *impair* an individual's ability to reasonably perform a job." TEX. LAB. CODE § 21.105 (emphasis added). So if a claimant's disability (that is, a mental or physical impairment) in fact limits her ability to perform the job she has or seeks, Chapter 21 simply

---

[12] The Court incorrectly asserts that the parties here "appear to agree that obesity, as opposed to morbid obesity, is not an impairment absent evidence of an underlying physiological disorder or condition." *Ante* at 13. To the contrary, Niehay argues that "obesity, and in particular morbid obesity, is accepted by the medical community as a physiological medical disorder" but agrees that because the University does not dispute that it regarded her as being morbidly obese, "[t]his Court does not need to reach the question of whether obesity is an impairment under the ADA, because this question is not presented here."

11

does not prevent the employer from terminating her or refusing to offer her the job "because of" that impairment. *See Proler*, 437 S.W.3d at 532 (quoting Section 21.105 and explaining that, like the federal requirement that the applicant be a "qualified individual" who "can perform the essential functions of the employment position," Chapter 21 "similarly extends [only to a claim based on] 'a physical or mental condition that does not impair an individual's ability to reasonably perform a job'").[13] Because Section 21.105 also uses the term "impair," its *exception* to Chapter 21's applicability necessarily applies equally as broadly as the definition of "disability." Just as an application of the common, ordinary meaning of "impairment" may expand the universe of

---

[13] *See Austin State Hosp. v. Kitchen*, 903 S.W.2d 83, 88 (Tex. App.— Austin 1995, no writ) ("Sections 21.051 and 21.105 of the Texas Act make it an unlawful employment practice for an employer to discharge a disabled person on the basis of a disability *when the disability does not impair the individual's ability to reasonably perform a job*." (emphasis added)); *Holt v. Lone Star Gas Co.*, 921 S.W.2d 301, 305 (Tex. App.—Fort Worth 1996, no writ) (citing Section 21.105's predecessor for the proposition that, if the claimant's "disability impaired his ability to reasonably perform the job in question, it would not have been an unlawful practice to have discharged [him] from his position"). Arguably, the University could have sought dismissal in this case on the ground that, under Section 21.105, Chapter 21 simply does not apply because Niehay's obesity impaired her ability to perform her job as a resident physician. But the University did not assert this ground and instead argued only that Niehay had no disability and, even if she did, the University did not terminate her because of that disability. And because the University did not assert it, Niehay has had no opportunity to argue why Chapter 21 applies despite Section 21.105. We must therefore limit our decision to the issues the University has raised and cannot decide today whether Section 21.105 prevents Niehay from asserting a claim under Chapter 21. My point here is simply that, even if applying the common, ordinary meaning of "impairment" would produce results as broad as the Court fears, the ultimate effect would not be to more broadly *expand* claims for disability discrimination under Chapter 21, but to more broadly *limit* them.

those who have a disability, in other words, Section 21.105 *reduces* the number of claimants who can sue under Chapter 21 when that disability impairs their job performance.

In summary, applying the statute's plain language in accordance with our well-established rules of construction requires a simple, three-step analysis that streamlines its application to every case and avoids the kind of legislative decision-making in which the Court engages today. First, did the claimant have a limitation or reduction in their mental or physical functions and abilities or a record of having such a limitation (or did the employer regard them as having one)? If not, they have no claim under Chapter 21. But if so, they had an "impairment," which leads to the second question: did that impairment substantially limit a major life activity (or did the employer regard it as more than a minor limitation that would last less than six months)? If not, they have no claim under Chapter 21. But if so, they had a "disability" under Chapter 21, leading to the third question: did that disability limit or reduce their ability to perform the job they had or were seeking? If so, then Chapter 21 does not apply and the claimant has no claim. But if not—if the disability substantially limited the claimant's daily life activities but not their ability to perform the job—then Chapter 21 applies and the employer may be liable for taking an adverse action against the claimant "because of" that disability.

Because other statutes, our decisions, and the statutory context confirm the common, ordinary meaning of "impairment" as used in Chapter 21, and because that meaning does not produce an absurd or nonsensical result, I would apply that meaning here. And nothing about

that meaning requires that the claimant's mental or physical impairment result from an underlying physiological disorder or any other particular cause.

## II.
## Federal Authorities

As noted, however, Chapter 21 also states that one of its express purposes is to "provide for the execution of the policies embodied in" the federal ADA. TEX. LAB. CODE § 21.001(3) (citing 42 U.S.C. §§ 12101 *et seq*.). In light of this express purpose, we have consistently looked to federal court decisions and federal administrative regulations for guidance when interpreting Chapter 21, including the terms "disability" and "impairment." *See Little*, 148 S.W.3d at 382 ("[B]oth the federal court decisions interpreting the ADA and the federal administrative regulations regarding the ADA guide our interpretation of the definition of 'disability' contained in chapter 21.").[14]

---

[14] *See also Proler*, 437 S.W.3d at 532 ("In construing Texas law on this subject, we consider federal civil rights law as well as our own caselaw."); *Haggar Apparel*, 154 S.W.3d at 100 ("[I]n construing and applying chapter 21, we are guided by federal law."); *Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 476 (Tex. 2001) ("[A]nalogous federal statutes and the cases interpreting them guide our reading of [Chapter 21]." (citing *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999))). Our concurring colleague emphasizes that, although federal authorities can helpfully "guide[]" our construction of Chapter 21, they are not authoritative or binding on Texas courts. *Ante* at 8 (Blacklock, J., concurring). I agree, but we should be particularly hesitant to construe Chapter 21 in ways inconsistent with clear federal authorities because Chapter 21 aims to do more than just execute the ADA's policies. Specifically, some of Chapter 21's provisions and requirements are aimed at ensuring that the State of Texas can participate in federal anti-discrimination programs and receive federal funds to support its participation. *See, e.g.*, TEX. LAB. CODE § 21.001(2) (stating that one purpose of Chapter 21 is to "identify and create an authority that meets the criteria" of federal law). Indeed, one interesting provision states

But on the issue before us today—whether an impairment qualifies as a disability only if it is caused by an underlying physiological condition—federal law provides no clear guidance and is conflicting at best. Like Chapter 21, the ADA prohibits discrimination "because of" a "disability" and defines the term disability by using the term "impairment," but it also does not define the term "impairment." 42 U.S.C. § 12102(1), (3). Exercising its rulemaking authority, however, the EEOC has adopted a regulation defining the term impairment to mean a "*physiological disorder or condition . . .* affecting one or more body systems." 29 C.F.R. § 1630.2(h)(1) (emphasis added).[15]

Applying this definition's plain meaning, weighing over four hundred pounds is undoubtedly a physiological condition that affects one or more body systems. The University argues, however, and the

---

that, if we were to construe a provision in a way that, in the view of the federal Equal Employment Opportunity Commission (the EEOC), disqualifies the Texas Workforce Commission "as a deferral agency or for the receipt of federal funds" under federal law, the Workforce Commission must nevertheless "administer this chapter to qualify for deferral status or the receipt of those funds until the legislature meets in its next session and has an opportunity to amend this chapter." *Id.* § 21.006. So while federal law does not dictate our construction of Chapter 21, we have consistently relied on it for guidance for good reason, even suggesting that Chapter 21's purpose includes the "*correlation* of state law with federal law in the area of discrimination in employment." *Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex. 1991) (emphasis added), *overruled on other grounds by In re United Servs. Auto. Ass'n*, 307 S.W.3d 299 (Tex. 2010).

[15] Exercising its rulemaking authority under Texas law, the Workforce Commission has adopted a rule that defines "impairment" in the same way. *See* 40 TEX. ADMIN. CODE § 819.112(8)(a). This Texas rule, however, applies only to provisions of Chapter 21 that address housing discrimination and fair-housing requirements, as opposed to employment discrimination. *See id.* § 819.112.

Court agrees, that to qualify as an impairment under the EEOC regulation's definition, the physiological condition must be an "*abnormal* bodily function or state," similar to a "disorder." *Ante* at 16 (emphasis added). But weighing over four hundred pounds *is* an abnormal bodily state. The "accumulation of fat cells" may, as the Court contends, be a "normal bodily *process*," *id.* (emphasis added), but that does not make a human habitus of over four hundred pounds a normal bodily *state* or *condition*. The regulation defines "disability" in terms of limiting mental and physical conditions, not underlying mental or physical processes. *See* 29 C.F.R. § 1630.2(h)(1).

This does not mean, as the Court suggests, that "any employee whose weight—or other physical characteristic—is even slightly outside the 'normal range' would have a physical impairment even with no underlying physiological cause." *Ante* at 18 (quoting *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 890 (7th Cir. 2019)). The statute requires an impairment, not just a condition. Like statutory definitions, regulatory definitions "must be interpreted in light of the ordinary meaning of the word being defined." *In re Ford Motor Co.*, 442 S.W.3d 265, 271 (Tex. 2014); *see also Tex. Comm'n on Env't Quality v. Maverick County*, 642 S.W.3d 537, 544 (Tex. 2022) (stating that courts interpret regulations "using the same principles" they apply in construing statutes (citing *Patients Med. Ctr. v. Facility Ins. Co.*, 623 S.W.3d 336, 341 (Tex. 2021))). And as discussed, the ordinary meaning of the word "impairment" is a loss or limitation of function or ability, without regard to its cause. In turn, a person whose physiological condition is "slightly outside the 'normal range,'" or even greatly outside the normal range,

16

would have an "impairment" only if that "abnormal" condition limits the person's physical functions and abilities. And even then, the impairment would qualify as a *disability* only if it *substantially* limits a major life activity or is perceived to do so to more than a *minor* degree. *See* TEX. LAB. CODE § 21.002(6), (12-a).

As an appendix to its regulation, the EEOC issued an "Interpretive Guidance" further explaining that the regulation's "definition of the term 'impairment' does *not* include physical characteristics such as eye color, hair color, left-handedness, or height, *weight*, or muscle tone that are *within 'normal' range and are not the result of a physiological disorder*." 29 C.F.R. app. § 1630.2(h) (emphases added). On the one hand, this Guidance statement provides support for the Court's assertion that, at least in the EEOC's view, "weight" can be a "characteristic." *See ante* at 18. But contrary to the Court's assertion, the Guidance also confirms that, in the EEOC's view, a "characteristic" like "weight" can be an impairment if it is not "within 'normal' range" or is "the result of a physiological disorder." 29 C.F.R. app. § 1630.2(h).

Like the University, the Court reads the Guidance statement to mean that weight can be an impairment "only if it falls outside of normal range *and* it occurs as the result of a physiological disorder." *Ante* at 18 (quoting *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1108 (8th Cir. 2016)). According to the Court, "changing the sentence to be a statement in the affirmative" confirms that reading. *Id.* But the Court changes only part of the statement. Focusing solely on weight, the Guidance states that "impairment" does *not* include weight that is within normal range *and* is not the result of a physiological disorder. *See* 29 C.F.R. app.

17

§ 1630.2(h). In shorthand, "impairment does *not* include X if X is A *and* is not B." Because of the use of "and," X must be *both* A and "not B" to qualify as an impairment. The meaning would be different, of course, if the Guidance stated that "impairment" does not include weight that is within normal range *or* is not the result of a physiological disorder. In that case, the shorthand would be that "impairment does not include X if X is A *or* is not B." And then X would be an impairment if it was (only) A or (only) "not B."

But we need not rely on my reading to confirm that result. To the extent we care what the EEOC thinks (and as discussed below, I'm not convinced we should), it has argued in the federal courts that, under its Guidance statement, weight "(1) is not an impairment when it is within the 'normal' range *and* lacks a physiological cause but (2) may be an impairment when it is *either* outside the 'normal' range *or* occurs as the result of a physiological disorder." *Taylor v. Burlington N. R.R. Holdings Inc.*, 904 F.3d 846, 851 (9th Cir. 2018) (emphases added).

Finally, as the Court concedes, the federal courts (and other state courts) have "disagree[d] with each other" as to the meaning of federal law on this point. *Ante* at 12; *see also id.* at 19 n.49 (citing *Richardson*, 926 F.3d at 887 (listing cases)). As Niehay notes, all the federal courts within the Fifth Circuit that have addressed the issue have declined to impose an underlying-physiological-disorder requirement for weight-related disability claims.[16] Although the Court hangs its hat on the

---

[16] *See, e.g.*, *Lumar v. Monsanto Co.*, 395 F. Supp. 3d 762, 778 (E.D. La. 2019), *aff'd*, 795 F. App'x 293 (5th Cir. 2020); *McCollum v. Livingston*, No. 4:14-CV-3253, 2017 WL 608665, at *35 (S.D. Tex. Feb. 3, 2017); *E.E.O.C. v. Res. for*

18

decisions of four other federal circuits, I find those decisions unreliable for the very reasons I cannot agree with the Court today.[17] To the extent those courts, or others, hold that *merely* being (or being regarded as) obese or even morbidly obese does not qualify as a disability, I agree. To qualify as a disability under the ADA or Chapter 21, the claimant must have a mental or physical limitation—an "impairment"—that is substantial or regarded as more than minor.

Personally, I would eschew any reliance on the EEOC's litigation positions or on its Interpretive Guidance and would place very little weight on its regulation, even though they support my interpretation of

*Hum. Dev., Inc.*, 827 F. Supp. 2d 688, 695–96 (E.D. La. 2011); *Lowe v. Am. Eurocopter, LLC*, No. 1:10CV24-A-D, 2010 WL 5232523, at \*7–8 (N.D. Miss. Dec. 16, 2010); *E.E.O.C. v. Tex. Bus Lines*, 923 F. Supp. 965, 978–79 (S.D. Tex. 1996).

[17] *See Richardson*, 926 F.3d at 888–90 (claiming that an underlying physiological disorder is required by "the ADA's text," but relying only on (and misreading) the EEOC's Guidance statement); *Morriss*, 817 F.3d at 1108, 1113 (claiming the same, but in any event concluding that the claimant established no disability because he was denied employment simply because he exceeded the employer's internal weight limits, not because the employer perceived him as having a physical impairment or "current health risk"); *E.E.O.C. v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 442 (6th Cir. 2006) (stating that an underlying physiological disorder is required, but the case was decided before the ADA Amendments Act and relied on *Sutton*, which Congress expressly rejected); *Francis v. City of Meriden*, 129 F.3d 281, 282, 286 (2d Cir. 1997) (holding the claimant failed to show discrimination based on a disability because the employer disciplined him only "for failing to meet a generally applicable weight standard," not because it "regarded him as suffering from a physiological weight-related disorder;" and explaining that "while a cause of action *may* lie against an employer who discriminates against an employee on the basis of the perception that the employee is morbidly obese *or* suffers from a weight condition that is the symptom of a physiological disorder, no cause of action lies against an employer who simply disciplines an employee for not meeting certain weight guidelines" (emphases added) (internal citations omitted)).

Chapter 21's definition of "disability." *See, e.g.*, *VF Jeanswear*, 140 S. Ct. at 1204 (Thomas, J., dissenting from denial of cert.) (asserting that judicial "reliance on and deference to the EEOC's regulation . . . seems inappropriate" and that "invocation of the EEOC Compliance Manual . . . directly conflicts with the constitutional duty of a judge to faithfully and independently interpret the law"). And because the federal circuits on which the Court relies today in turn relied so heavily on the Guidance, I would not rely on them to construe Chapter 21 either. Instead, I would focus—as I have done in Part I above—on "the most useful, and perhaps dispositive, evidence—the text" of Chapter 21 and the ADA. *Id.* And as noted, the statutory text does not require that the claimant's impairment result from any particular cause.

### III.
### Niehay's Evidence

If we apply the common, ordinary meaning of the term "impairment," as Chapter 21 uses that term to define "disability," the University does not contest that some evidence in this record establishes that the University perceived Niehay as having a disability. Indeed, the evidence conclusively establishes that the University perceived Niehay not only as being morbidly obese but also as being physically impaired as a result of her obesity. As to that issue, the University contends only that no evidence supports the conclusion that the University perceived her obesity as being caused by an underlying physiological disorder. Because the statute's plain language does not impose that requirement, the record establishes that the University regarded Niehay as having a disability.

The question then becomes whether the record contains some evidence that the University terminated Niehay "because of" her disability. To be sure, the record contains ample evidence that the University disciplined and ultimately dismissed Niehay for numerous legitimate, nondiscriminatory reasons. From the first formal negative report about her performance in December 2015 through and until the University's president upheld Niehay's dismissal in May 2016, the record is littered with evidence that the University acted on reports of Niehay's inadequate attendance, performance, motivation, attitude, and patient care, as well as an apparent defensiveness and unwillingness to address her patients' needs.

But despite the overwhelming weight of this evidence, we must yet affirm the court of appeals' judgment if *some* evidence would enable a reasonable juror to conclude that Niehay's obesity-related impairments were "a motivating factor" for the University's adverse actions, even if "other factors also motivated" those actions. *See Tex. Tech Univ. Health Sci. Ctr.–El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020). Niehay contends that direct evidence supports that assertion, meaning evidence that, "if believed, proves the fact . . . without inference or presumption." *Williams-Pyro, Inc. v. Barbour*, 408 S.W.3d 467, 478 (Tex. App.—El Paso 2013, pet. denied) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)).[18] I agree.

---

[18] Because it is often difficult to prove discriminatory intent with direct evidence, a claimant may alternatively rely on circumstantial evidence instead. *Flores*, 612 S.W.3d at 305. "When a plaintiff relies on circumstantial evidence to establish a discrimination claim, we follow the burden-shifting framework the United States Supreme Court established in *McDonnell*

Some of the evidence on which Niehay relies relates to a conversation the residency program's director, Dr. Wells, had with the University's assistant general counsel in January 2016, seeking legal advice on how to properly respond to Niehay's performance issues. Wells asked Yolanda Salas, the residency program's coordinator, to attend that meeting to take notes, and Salas later testified in her deposition that Wells suggested to the attorney that Niehay was performing poorly "because of her weight." According to Salas, the attorney told Wells that she could not discipline Niehay for that reason and would have to "find other reasons than that" to avoid an appearance that she was discriminated against because of her weight.

The University objected to Niehay's reliance on Salas's testimony because the conversation was a privileged attorney–client communication and Salas (who, by the time of her deposition, had asserted her own, separate discrimination claim against the University) had no authority to waive that privilege or disclose the conversation. Niehay contends the University failed to preserve and thus waived the privilege by failing to instruct Salas not to answer questions eliciting the communications or, alternatively, by failing to suspend the deposition to obtain a ruling from the trial court.[19] I need not resolve

_____

*Douglas Corp. v. Green*, [411 U.S. 792 (1973)]." *Id.* Because Niehay contends that direct evidence establishes the University's intent in this case, we need not apply the *McDonnell Douglas* analysis here.

[19] *See* TEX. R. CIV. P. 199.5(f) ("An attorney may instruct a witness not to answer a question during an oral deposition only if necessary to preserve a privilege . . . or secure a ruling pursuant to paragraph (g)."), 199.5(g) ("If . . . the deposition is being conducted or defended in violation of these rules, a party or witness may suspend the oral deposition for the time necessary to

22

this dispute, however, because other direct evidence—besides the communications between Wells and the attorney—supports Niehay's claim that her obesity-related impairments were a motivating factor behind the University's adverse actions.

Specifically, the doctor who submitted the initial report about Niehay's impaired performance stated in her report that she "blame[d]" Niehay's performance "struggle[s]" on her "habitus." Wells in turn reported to at least one physician that Niehay's "difficulties with simple procedures" were "largely due to her body habitus and health state." A lot of evidence establishes that Niehay's refusals and delays in performing procedures on patients were due to the fact that the emergency-medicine department in which she worked did not stock "double-extra-large" sterile surgical gowns, which Niehay was required to wear for certain patient procedures.

Even more directly, Niehay testified by deposition that after she was dismissed, Salas told her that the University had taken "unscrupulous" actions behind Niehay's back that Salas "believed were related to my weight and not my performance." According to Niehay, Salas said she "felt like the reason why they were treating me in the way that they were was due to my weight and my disability." And most

---

obtain a ruling."), 199.5(e) ("Objections to questions during the oral deposition are limited to 'Objection, leading' and 'Objection, form.' Objections to testimony during the oral deposition are limited to 'Objection, nonresponsive.' . . . All other objections need not be made or recorded during the oral deposition to be later raised with the court."), 199.6 ("Any party may, at any reasonable time, request a hearing on an objection or privilege asserted by an instruction not to answer or suspension of the deposition; provided the failure of a party to obtain a ruling prior to trial does not waive any objection or privilege.").

importantly, Salas herself testified that Wells was "picking on" Niehay, was "trying to find an excuse to find something [Niehay] was doing wrong," wouldn't hear Niehay's "side of the story," and "mention[ed] on occasions that [Niehay] couldn't perform due to her weight." And, according to Salas, *after* she and Wells left the meeting with the attorney, Wells told Salas "that she felt like [Niehay] wasn't performing well because of her weight." Salas testified that Wells treated Niehay "differently in a way because of her weight" and "discriminate[d] against her because of her weight."

Without considering evidence regarding the conversation between Wells and the University's attorney, this evidence constitutes some evidence that would enable a reasonable juror to conclude that the University took adverse employment actions against Niehay "because of" physical impairments related to morbid obesity.

## IV.
## Conclusion

In this case, we are not called upon to decide whether Chapter 21 or the ADA should treat obesity-related physical impairments as a disability, or even to decide whether Niehay can or should prevail on her Chapter 21 claim. As explained above, the first question is for the legislature to decide, and the second must depend on the resolution of both legal and factual issues that are not presently before the Court. As a factual matter, a jury could certainly conclude on this record that the University dismissed Niehay for an array of permissible reasons unrelated to her physical limitations. And as a matter of law, her claims might not ever reach a jury if Section 21.105 makes Chapter 21 inapplicable under the undisputed facts. But those questions are not

before us today. The only questions before us today are whether Niehay presented some evidence that the University regarded her as having a "disability" and dismissed her "because of" that disability. Applying Chapter 21's plain language in accordance with our well-established rules of statutory construction, I conclude she did. Because the Court holds otherwise, I respectfully dissent.

_____
Jeffrey S. Boyd
Justice

**OPINION FILED:** June 30, 2023